**Frank LANDRY, et al.,
Plaintiffs–Appellants,**

v.

**AIR LINE PILOTS ASSOCIATION IN-
TERNATIONAL AFL–CIO, Taca Air-
lines, S.A. and Charles J. Huttinger,
Defendants–Appellees.**

No. 88–3363.

United States Court of Appeals,
Fifth Circuit.

Jan. 31, 1990.

Opinion Modified, Rehearing Denied
April 27, 1990.

Tom W. Thornhill, Slidell, La., R. Neal Wilkinson, Baton Rouge, La., Richard A. Machen, Slidell, La., for plaintiffs-appellants.

Stephen B. Moldof, Cohen, Weiss & Simon, Michael L. Winston, New York City, Robert H. Urann, Metairie, La., for Airline & Hutt.

Jerry J. Blouin, New Orleans, La., for Fringe.

Joseph Z. Fleming, John B. Waldrip, New Orleans, La., for TACA.

Before BROWN, JOHNSON and DAVIS, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

Several airline pilots brought this action against their former employer, union, union representative, and the administrator of their pension plan. The pilots alleged violations of labor law, ERISA, and RICO. Granting motions for summary judgment, the Court held: (i) the statute of limitations barred the labor law claims; (ii) ERISA imposed no fiduciary duties on the defendants; and (iii) the pilots failed to meet the necessary elements of a RICO claim. The Court also granted a protective order preventing further discovery of the defendants. On appeal, we affirm the lower court's holding with respect to the statute of limitations and the protective order. However, we find that summary judgment was improper on the ERISA and RICO claims. Accordingly, we reverse and re-

mand to the trial court the ERISA and RICO claims.

### I. The Facts

#### A. History of Relations between TACA and ALPA

##### 1. If at first you don't succeed ...

TACA International Airlines, S.A. (TACA), incorporated under the laws of El Salvador, operates in Central America and the United States. From 1949 until 1985, all TACA pilots were based in New Orleans, Louisiana. In 1968, the Airline Pilots Association, International, AFL–CIO (ALPA), was certified as the collective bargaining representative for all pilots employed by TACA, and thereafter negotiated numerous collective bargaining agreements with TACA.

The relevant history of this case begins over two decades ago. In 1969, shortly after TACA entered into its first agreement with ALPA, the Republic of El Salvador requested that TACA relocate its pilot base from New Orleans to El Salvador. When TACA attempted to comply with the request of the Salvadoran government, ALPA sought and obtained an injunction, maintaining that if the relocation occurred, ALPA could no longer, under Salvadoran law, represent the pilots. A bar of representation would have abrogated the recently-entered collective bargaining agreement between ALPA and TACA. This Court affirmed the district court injunction. *Ruby v. TACA International Airlines, S.A.*, 439 F.2d 1359 (5th Cir.1971).

##### 2. ... try, try, again ...

In October of 1979, TACA and ALPA entered into a collective bargaining agreement, effective January 1, 1980 and amendable on December 31, 1983 (the 1980 collective bargaining agreement). In October, 1983, ALPA and TACA commenced negotiations to amend and continue the 1980 collective bargaining agreement.

However, on December 20, 1983, the Republic of El Salvador adopted a new Constitution; Article 110, § 4 of that constitution provided that Salvadoran public service

companies must have their work center and base of operations in El Salvador. *Airline Pilots Ass'n, Int'l v. TACA, Int'l Airlines, S.A.,* 748 F.2d 965, 968 (5th Cir.1984), *cert. denied,* 471 U.S. 1100, 105 S.Ct. 2324, 85 L.Ed.2d 842 (1985). As a result, while in the midst of negotiations, TACA announced its intention to immediately relocate its pilot base from New Orleans to El Salvador, to unilaterally terminate the existing agreement and impose new terms and conditions of employment on its pilot employees, and to withdraw its recognition of ALPA. R. 503. Pilots were given until December 31, 1983 to accept the new terms or lose their employment with TACA. Meanwhile, because of the potential that the pilots would not move, TACA began advertising for new pilots.

ALPA filed a lawsuit in the United States District Court for the Eastern District of Louisiana, seeking injunctive relief against TACA. Judge Feldman issued a permanent injunction prohibiting TACA from relocating the pilot base, unilaterally changing the terms of employment, recruiting replacement pilots, and interfering with the pilots' choice of ALPA as their bargaining agent.

This court affirmed the injunction, but stated

> we neither hold nor suggest that TACA may not relocate its pilot base. We hold only that TACA must relocate its pilot base and effect the other intended steps in accordance with the substantive laws and procedures set forth in the Railway Labor Act and other relevant domestic laws.

*Id.,* at 972.

### 3. ... *until you do*

Between 1984 and 1985, TACA and ALPA continued negotiations under the auspices of the National Mediation Board (NMB). On July 24, 1985, TACA and ALPA reached an agreement entitled "Pilots' Agreement," which superseded the 1980 collective bargaining agreement under which the parties had been operating. The "Pilots' Agreement" provided that ALPA would not oppose TACA's relocation of its pilot base to El Salvador after August 31, 1985. All pilots on the seniority list as of June 30, 1985 could elect either: (i) to receive severance pay ($1,200.00 to each pilot for each full year of service and *pro rata* amounts for partial years, with length of service calculated through August 31, 1985), and other benefits (passes and insurance), or (ii) to continue their employment as TACA pilots, based in El Salvador. R. 504.

On July 24, 1985, Mr. Charles J. Huttinger, a TACA pilot who represented ALPA in the negotiations with TACA, sent a letter to all TACA pilots stating that "The Association has reached a tentative agreement (subject to ratification) with TACA.... The Company has agreed to a total package which we believe justifies your support."

Some of the pilots allegedly understood the July 24, 1985 letter to mean that the agreement would not be final until it was ratified by the individual pilots. However, on August 3, 1985, a representative of TACA sent a memorandum to all TACA pilots, informing them that "an agreement [has been] reached by which TACA will move its pilots base to El Salvador effective September 1, 1985." The memorandum further stated that "the decision to continue working for the company or retire must be made by August 15, 1985, at the latest." Each of the named plaintifs, except Gary Zyriek, elected to take severance pay. Mr. Zyriek had changed jobs and was flying for United Airlines by June 30, 1985, the date of eligibility for severance payments.

The July 24, 1985 "Pilots' Agreement" further provided that TACA's obligation to contribute to the pilots' retirement fund would cease as of August 31, 1985. Although the parties dispute the effective date of the retirement plan (*see infra*), it was formally implemented on April 18, 1985. Fringe Benefit Administrators (FBA) was named as the plan administrator and the First National Bank of Covington was the plan trustee.

On December 17, 1985, TACA and ALPA entered into a final "settlement agree-

ment" which resolved all claims arising out of the July 24, 1985, "Pilots' Agreement." Among other things, the agreement provided that "ALPA agrees and acknowledges that TACA has no further obligations to the individuals who selected the severance option under the 'Pilots' Agreement'.... concerning insurance coverage or benefits of any kind, or premium payments of any kind."

### B. Procedural History

In the original Complaint, the pilots [1] asserted that the July 24, 1985 "Pilots' Agreement" was negotiated and executed in breach of ALPA's duty of fair representation (DFR) to the TACA pilots and TACA's prior collective bargaining agreement with ALPA, in violation of the Railway Labor Act (RLA), 45 U.S.C. §§ 151–88, and the National Labor Relations Act (NRLA), 29 U.S.C. §§ 141–87. Pilots sought approximately $30 million in damages. R. 1–18. Pilots did not file their Complaint until July 23, 1986. R. 1.

Pilots alleged that ALPA agreed to enter into the July 24, 1985 agreement as a result of TACA's threat to sue ALPA because some of the pilots purportedly sabotaged TACA property at ALPA's direction. The pilots characterized this conduct as a breach of the duty of fair representation by ALPA. In addition, the pilots have asserted that Mr. Huttinger was unqualified to represent ALPA in the negotiation of the "Pilots' Agreement." Huttinger had been placed on "sick" status by TACA, and according to the pilots, under the Constitution and By-Laws of ALPA, a pilot classified as "sick" was not permitted to hold an office within the union.

Moreover, the pilots have filed the affadavit of Emile Cerisier, one of the plaintiffs. Mr. Cerisier states that Mr. G.M. Padgett was a TACA pilot who was a member of the ALPA negotiation team that arranged the relocation of the pilot base to El Salvador. The pilots claim that Mr. Padgett should not have been allowed on the team because he had been suspended by TACA for sabotaging TACA equipment.

The Original Complaint also alleged that ALPA, TACA, and FBA violated the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001–1461. The pilots claim that ALPA, TACA, and FBA breached fiduciary duties imposed by ERISA in the administration and implementation of the Plan. More specifically, the pilots allege that the defendants: (i) delayed Plan implementation for three years; (ii) refused to disclose Plan details despite repeated requests; (iii) failed to disclose various information about the fund's location, amount, etc.; and (iv) colluded among each other to allow Huttinger to illegitimately receive retirement benefits.

FBA filed an answer on October 22, 1986. R. 261. ALPA and TACA filed motions to dismiss or, alternatively, for summary judgment, contending that the DFR/breach of contract claim was barred by the applicable six-month statute of limitations and that the pilots had failed to state a claim for relief under ERISA. R. 33–51, 240–60. On January 13, 1987, the pilots noticed the depositions of Charles Huttinger and First National Bank, eventually postponed at the request of the defendants. R. 383–86.

On February 10, 1987, while those motions were pending, the pilots asked the District Court to stay all proceedings and to transfer the case for consolidation with an action filed by ALPA in 1983, *Air Line Pilots Ass'n, Int'l v. TACA Int'l Airlines, S.A.*, Civ. No. 83–6238 (E.D.La.), *aff'd*, 748 F.2d 965 (5th Cir.1984), *cert. denied*, 471 U.S. 1100, 105 S.Ct. 2324, 85 L.Ed.2d 842 (1985), for the expressed purpose of seeking an adjudication that TACA was in contempt of an injunction issued to ALPA in the 1983 case. R. 408–13. Judge Feldman, who had presided over the earlier action, denied pilots' motion, explaining that

---

1. There were fifteen plaintiff pilots at the trial court: Frank Landry, Jules Corona, Charles South, Robert A. Massa, Don Johnson, Thomas Brignac, T.Q. Howard, Robert Lukenbill, Bert Haffner, Walter Keller, Joe Haas, Gary Zyriek, Don Jenkins, Emile Cerisier, and M. Letona. The same pilots are appellants on appeal, except for Thomas Brignac, Robert Lukenbill, Bert Haffner, and Gary Zyriek, who have dropped out of the case.

"[t]his case had been closed for several years, and this Court no longer has any jurisdiction in this matter." Supplemental Record on Appeal, Minute Entry, (Feldman, J.), March 13, 1987. By subsequent Order, the Court below denied pilots' motion to transfer, determining, in consultation with Judge Feldman, "that the issues presented in this matter [the case *sub judice* ] are not sufficiently similar to warrant transfer." R. 427.

On March 11, 1987, the pilots filed an amended and supplemental Complaint, alleging violations of the Racketeer Influenced and Corrupt Organizations Act (RICO) 18 U.S.C. §§ 1961–68, and requesting nearly $100 million in damages. R. 493–99. Huttinger was added as a defendant in the Amended Complaint, which incorporated all of the allegations in the original Complaint.

By Opinion and Order dated April 24, 1987, the District Court granted the ALPA and TACA motions directed at the Original Complaint, holding, *inter alia,* that the pilots had failed to demonstrate that "TACA or ALPA should be held liable as a 'fiduciary' within the meaning of ERISA and, to the extent that the pilots intend to assert a 'hybrid' claim under the RLA,[2] it is clearly barred by the six-month [statute] of limitations." R. 511.

In May, 1987, TACA, ALPA, and Huttinger responded to the RICO claim in the Amended Complaint by filing motions to dismiss or alternatively, for summary judgment. R. 516–83; 584–608. The Court denied the motions without prejudice and ordered the pilots, in accordance with a newly adopted Standing Order, to file a RICO Case Statement (RICO St.)[3] R. 759–62. Pursuant to express leave of the Court, R. 758, ALPA, Huttinger, and TACA renewed their dispositive motions, R. 855–974, 798–854, following the filing of pilots' RICO St. R. 764–90.

On November 18, 1987, the defendants moved for protective orders to quash depositions of TACA, Huttinger, and FBA that the pilots had noticed for October. R. 1007. The protective order was granted on December 11, 1987. R. 1104.

On December 14, 1987, the pilots filed a motion for the Court to reconsider the application of tolling principles to the dismissal of their DFR claims, contending that the Court had "overlooked the doctrine of equitable tolling." R. 1109. A request by the pilots to file a supplemental brief in support of their motion to reconsider was disallowed. On February 29, 1988, the Court denied the pilots' motion for reconsideration and ordered the pilots to respond to the defendants' request for sanctions.

By Opinion and Order dated March 17, 1988, the District Court granted summary judgment on the RICO claim. R. 1295–1311. Judgments pursuant to F.R.Civ.P. 54(b) in favor of ALPA and TACA were entered on April 28, 1988, R. 1315, and, as to Huttinger, on May 4, 1988. R. 1316. Eleven of the fifteen plaintiffs filed a notice of appeal on May 27, 1988.

The following issues are presented on appeal: (i) Did the District Court apply the appropriate statute of limitations to the pilots' labor law claims, and did it give adequate consideration to when the limitations period began to run? (ii) Did the lower court properly find no ERISA plan was established until the spring of 1985, and that neither ALPA, Huttinger, nor TACA were fiduciaries under ERISA? (iii) Did the court below err in ruling against the pilots' RICO claims? (iv) Did the trial judge abuse his discretion in quashing discovery depositions the pilots had noticed for hearing?

## II. *Statute of Limitations*

In their Original Complaint, pilots alleged that ALPA breached its duty of fair representation (DFR), implied under the RLA. They also alleged that TACA was a party to the DFR breach. The breach arose during the process of negotiating a new collective bargaining agreement—which ultimately resulted in the removal of

---

**2.** *See infra.*

**3.** *See* Appendix A; *see also Elliott v. Foufas,* 867 F.2d 877, 880 (5th Cir.1989).

the TACA pilot base to El Salvador and the severance of all of the plaintiffs to this action. The trial court found that by its allegations, pilots brought a "hybrid" claim.[4] Such claims are subject to a six month statute of limitations.[5] The complaint was filed August 25, 1986, but the cause of action accrued, at the latest, on December 17, 1985 when the settlement agreement was signed. Thus the pilots' labor law claims were held time barred.

Pilots challenge this ruling on several grounds. They assert that (1) this is not a *DelCostello* "hybrid" action; (2) more appropriate limitations periods may be found by resort to Louisiana's one year statute of limitations for tort law and ten year statute of limitations for contract law; (3) the running of the statute should have been tolled until defendants' fraud and collusion was discovered by pilots; (4) defendants should have been required to honor the judgment that forbid their relocation unless it was accomplished in compliance with the RLA; (5) any decertification of ALPA as the employees' collective bargaining agent should have been carried out by the National Mediation Board.

■ We find that dismissal under F.R. Civ.P. 56(c) was warranted because it was clear from the face of the complaint and the declarations submitted that no material facts were in dispute and that defendants were entitled to judgment as a matter of law on the undisputed facts.[6] We agree with the trial court that *DelCostello* states the appropriate limitations period and that pilots' labor law claims were time-barred.

Pilots argue that *DelCostello* does not apply for two reasons. First, this case implicates the RLA, while *DelCostello* dealt with a violation of § 301 of the NLRA. Second, *DelCostello* arose in the context of a grievance proceeding under an existing collective bargaining agreement. In the case *sub judice* by contrast, the dispute arose out of the process of negotiating a collective bargaining agreement. There was no grievance procedure in place, so a time bar on the federal cause of action would preclude pilots from all avenues of relief.

The Fifth Circuit has held that when a claim alleges unfair representation, it is subject to *DelCostello*'s six month limitations period even when it arises under the RLA, rather than the NLRA as was the case in *DelCostello*.[7] The claim also need not be a "classic" hybrid claim. The six month limitation period is applicable whenever there is a DFR claim.[8] Pilots have clearly alleged a breach of the duty of fair representation.

In addition, at least one other circuit has held explicitly that the limitations period should apply "equally to disputes arising

---

4. In the original "hybrid" action, an employee brought a claim against his employer under § 301 of the NLRA for breach of the collective bargaining agreement and against his union for breach of the duty of fair representation implied under the NLRA. The two actions are inextricably intertwined, for in order to prevail on one, the employee must prevail on both. *See DelCostello v. International Bhd. of Teamsters*, 462 U.S. 151, 164–65, 103 S.Ct. 2281, 2290–91, 76 L.Ed.2d 476, 489 (1983). As we shall develop, *infra*, this original meaning has been expanded to apply to the type of claim brought here.

5. *DelCostello v. International Bhd. of Teamsters*, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983). This limitation period is imported from § 10(b) of the NLRA and applies both to the cause of action against the union and to the one against the employee. The *DelCostello* court chose to apply this analogous federal statute of limitations rather than borrow from state law.

6. "[T]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." F.R.Civ.P. 56(c).

7. *Brock v. Republic Airlines, Inc.*, 776 F.2d 523, 525–26 (5th Cir.1985) (The "six-month statute of limitations in § 10(b) of the [NLRA] controls hybrid actions brought under the [RLA]. Hybrid claims under either act originate from an identical implied duty of fair representation and involve a similar balancing of competing interests."); *see also Coyle v. Brotherhood of Ry., Airline & S.S. Clerks*, 838 F.2d 1404, 1405 (5th Cir.1988).

8. *Richardson v. United Steelworkers of America*, 864 F.2d 1162, 1167 (5th Cir.1989); *see also Degan v. Ford Motor Co.*, 869 F.2d 889, 892–93 (5th Cir.1989).

from the process of negotiation and to those arising from actions under the agreement resulting from the negotiations."[9] We agree that the rationale of *DelCostello* applies to the facts before us now. Thus pilots' labor law claims are subject to a six month statute of limitations.

In support of their second argument, pilots cite *United Parcel Service, Inc. v. Mitchell,*[10] for the proposition that state law provides the appropriate limitations period. *Mitchell* held that a state statute of limitations for vacation of an arbitration award rather than for breach of contract governed a similar suit. Two questions were left unanswered in *Mitchell,* however: (i) what statute of limitations should govern the action against the union (only the action against the employer was subject to the arbitration statute) and (ii) whether the statute of limitations should be borrowed from federal law, namely NLRA § 10(b), 29 U.S.C. § 160(b), rather than from state law. *DelCostello* resolved these unanswered questions holding that it was indeed appropriate to borrow from federal law and apply the six month statute of limitations from § 10(b). That limitations period applies to the claims against the employer and those against the union.[11]

In the pilots' third challenge to the trial court's ruling, they assert that the trial court should have applied the doctrine of equitable tolling to find that pilots' claims were not barred by the statute of limitations. Pilots argue that they didn't know of the fraud and collusion perpetrated upon them until less than six months before they filed suit. They do not, however, detail the fraud and collusion which kept this knowledge from them or what and how they found out about it.

Pilots begin by arguing that where fraud and collusion have been alleged, *DelCostello* is inapplicable and a two year statute of limitations set forth in the RLA applies.[12] *Brock v. Republic Airlines, Inc.,*[13] the only case pilots cite for this proposition, does not go nearly as far as pilots would take it. The RLA's statute of limitations applies only to actions arising under its own provisions; pilots have not alleged a violation of those provisions. The "fraud and collusion" Brock alleged denied him a fair hearing before the National Railroad Adjustment Board which issued the order Brock appealed.[14] Pilots do not appeal an Adjustment Board order, nor do they allege fraud and collusion in connection with such an order. In short, their claims fall entirely outside the parameters of *Brock.*

■ Even though *DelCostello* does apply, and not *Brock*'s two year limitations period, pilots nevertheless argue that they meet the six month statute of limitations. Eight months after the DFR claim was dismissed, pilots moved for reconsideration of the dismissal arguing that the trial court had "apparently overlooked the doctrine of equitable tolling in its ruling."[15] Pilots argued that the statute should have been tolled until a time less than six months before they filed suit because the defendants had fraudulently concealed the facts that gave rise to their cause of action. The trial court found that their motion had no merit because the issue was not adequately raised when the claims were initially disposed of and pilots failed to show a proper basis for the exercise of equitable tolling. We agree.

Allegations of fraudulent concealment do not free plaintiffs of their obligation to

---

9. *United Independent Flight Officers v. United Air Lines,* 756 F.2d 1262, 1271 (7th Cir.1985).

10. 451 U.S. 56, 101 S.Ct. 1559, 67 L.Ed.2d 732 (1981).

11. *DelCostello,* 462 U.S. at 154–55, 103 S.Ct. at 2285–86, 76 L.Ed.2d at 482–83.

12. 45 U.S.C. § 153 (First) (r), the section pilots claim is applicable, provides:

 All actions at law based upon the provisions of this section shall be begun within two years from the time the cause of action accrues

under the award of the division of the Adjustment Board, and not after.

13. 776 F.2d 523, 526–27 (5th Cir.1985).

14. *Id.* Such a cause of action is specifically provided for in 45 U.S.C. § 153 (First) (p) and therefore subject to the two year limitation period established in 45 U.S.C. § 153 (First) (r).

15. R. 1110.

exercise reasonable diligence to discover frauds perpetrated against them once they are on notice that such acts might have occurred.[16] Plaintiffs' own affidavits submitted before the summary judgment and with the motion for reconsideration show they were on "inquiry notice" if not actual notice of the acts that form the basis of their DFR claim for much longer than six months before they filed suit.

For example, plaintiffs allege that Huttinger misrepresented that the Pilots' Agreement would be subject to ratification in July 1985; pilots knew by August 3, 1985 that the agreement was to be immediately implemented without ratification.[17] Haffner, one of the pilots, was aware in July or August 1985 that Huttinger and ALPA had no alternative but to take the buyout. ALPA would not support the pilots through a strike because (i) ALPA was financially depleted and could not afford to do so and (ii) ALPA had been threatened with suit by TACA and ALPA's legal department felt they would lose.[18] In the spring of 1985, while negotiations were ongoing, Zyriek—another pilot—learned from a vice president of TACA that Huttinger was not qualified to represent the pilots and that Huttinger and Padgett were lying to the pilots about the course of the negotiations.[19]

At least some of the pilots were informed about the events taking place and potential problems with the negotiations. Many of the pilots also declared that they were aware of and asked by ALPA to participate in sabotage of TACA equipment. This alone should have put them on notice that things were not as they should be. Finally, *First Federal Savings and Loan Assoc. of Miami v. Mortgage Corp. of the South*[20] holds that ignorance of one aspect of an alleged fraud, where many other facts were known, is insufficient to delay the running of the statute.

Given these allegations, there is no question that the pilots were on inquiry notice of the labor law claims they raised in this suit in the spring or summer of 1985. Pilots have not alleged or provided any proof which would tend to show that defendants actively concealed their conduct or that the pilots exercised reasonable diligence, from that time until less than six months before they filed suit, in order to learn of their legal claims.[21] The trial court did not abuse its discretion in failing to grant reconsideration. No fact issues regarding the pilots' exercise of diligence in finding the grounds of their complaint were presented for resolution.

Pilots' fourth argument measures the actions of ALPA and TACA against an injunction. In 1983, El Salvador adopted a new Constitution which required Salvadoran public service companies to have their

---

**16.** *Jensen v. Snellings,* 841 F.2d 600, 607 (5th Cir.1988), *reh'g granted in part* (unpublished opinion).

 [A]n act of concealment should not relieve the plaintiff of his duty to exercise reasonable diligence to discover the fraud.... Concealment by the defendant is only a factor to be considered in determining when the plaintiff should have discovered the fraud.

 The requirement of diligent inquiry imposes an affirmative duty upon the potential plaintiff.... A plaintiff who has learned of facts which would cause a reasonable person to inquire further must proceed with a reasonable and diligent investigation, and is charged with the knowledge of all facts such an investigation would have disclosed. (Citations omitted).

Although *Jensen* dealt with alleged securities fraud, its reasoning extends to this situation. Like investors, employees "are not free to ignore storm warnings" that would alert a reasonable employee to the possibility of fraud. *Id.*

**17.** *See* Amended Complaint at ¶¶ 41–42, R. 495–96; ALPA's Statement of Material Facts Not in Dispute at ¶ 10, R. 571 and Pilots' Controverted Statements at ¶ 10, R. 727.

**18.** Declaration of Bert Haffner, R. 1179–1181.

**19.** *See* Declaration of Gary Zyriek, R. 1196–98.

**20.** 650 F.2d 1376, 1378–79 (5th Cir.Unit B 1981).

**21.** *United Klans of America v. McGovern,* 621 F.2d 152, 153 (5th Cir.1980):

 Fraudulent concealment tolls the statute of limitations. To rely on this tolling doctrine, "plaintiff must show that the defendants concealed the conduct complained of, and that he failed, despite the exercise of due diligence on his part, to discover the facts that form the basis of his claim."

*Citing In re Beef Industry Antitrust Litigation,* 600 F.2d 1148, 1169 (5th Cir.1979).

bases in El Salvador. Pursuant to that new requirement, TACA attempted to move its pilots base to San Salvador. ALPA immediately sought an injunction against the move which was granted by the district court and upheld by the Fifth Circuit.[22] The injunction did not prevent TACA from relocating its base. It simply provided that "TACA must relocate its pilot base, and effect the other intended steps in accordance with the substantive law and procedures set forth in the Railway Labor Act and other relevant domestic laws."[23] The pilots contend that TACA effected its move in violation of the RLA and thus is in violation of the injunction.

Pilots did not raise this issue until February 1987—long after they had filed this action. We find that the courts below acted properly in refusing to reopen that case. The issues involved in the old case and the current one are not substantially similar and the parties are different—only TACA was bound by the injunction. A transfer or consolidation to resolve this issue would have complicated the case—not simplified it.

Pilots' final argument against the operation of *DelCostello* and the bar of the six month statute of limitations is to classify the actions of ALPA and TACA as an improper attempt to decertify ALPA as the bargaining agent for the pilots. In this guise, pilots argue that the rationale of *DelCostello* is inappropriate.[24]

Disputes which involve the determination of the certified representative of airline employees in collective bargaining and contract administration are classified by the RLA as "representation" disputes. Such disputes are governed by Section 2,

Ninth of the RLA,[25] which provides that "it is the duty of the [National Mediation] Board to investigate any dispute as to who is the collective bargaining representative of employees and to certify the organization properly designated."[26] We have no jurisdiction over this claim.

> The Act commits disputes involving a determination of who is to represent airline employees in collective bargaining to the exclusive jurisdiction of the National Mediation Board. A court may not entertain an action involving such a dispute even if it arises in the context of otherwise justiciable claims.[27]

In conclusion, we hold that pilots' labor law claims were time barred. A straightforward application of *DelCostello*, as it has evolved, compels this result. The remainder of pilots' arguments—equitable tolling, enforcement of a prior injunction, and wrongful decertification of ALPA—avail them not at all.

### III. Erisa Claims

#### A. Did a "Plan" Exist Before April 18, 1985?

The fiduciary obligations created by Title I of ERISA apply only to established "plans." Section 401(a), 29 U.S.C. § 1101(a) (fiduciary responsibilities apply to employee benefit *plans*); Section 4(a), 29 U.S.C. § 1003(a) ("this subchapter shall apply to any employee benefit *plan* if it is established or maintained" by an employer, employee organization, or both) (emphasis added). Decisions as to whether or when to establish a plan, or how to design a plan, are not subject to any ERISA fiduciary obligation.[28] Nor does any fiduciary obli-

---

22. *See Airline Pilots Ass'n International, AFL-CIO v. TACA International Airlines, S.A.*, 748 F.2d 965 (5th Cir.1984), *cert. denied*, 471 U.S. 1100, 105 S.Ct. 2324, 85 L.Ed.2d 842 (1985).

23. *Id.* at 972.

24. Pilots do not explain why they believe this characterization makes *DelCostello* inapplicable, nor do they state which statute of limitations then becomes applicable or why. We respond to pilots' arguments without the need to answer these questions.

25. 45 U.S.C. § 152, Ninth.

26. *International Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of America v. Texas International Airlines, Inc.*, 717 F.2d 157, 159 (5th Cir.1983).

27. *Id.* at 161 (citations omitted).

28. *See UMWA Health & Retirement Funds v. Robinson*, 455 U.S. 562, 573–76, 102 S.Ct. 1226, 1232–34, 71 L.Ed.2d 419 (1982); *NLRB v. Amax Coal Co.*, 453 U.S. 322, 336–38, 101 S.Ct. 2789,

gation arise during the negotiation or execution of an agreement regarding future pension benefits.[29] Thus, we must determine when the retirement plan for the TACA pilots went into effect, so that we can decide when any fiduciary duties may have been created.

A pension plan subject to ERISA is one which is "established or maintained by an employer or by an employee organization or both" to provide retirement income to employees. Section 3(21)(A), 29 U.S.C. § 1002(21)(A). ALPA cites *Donovan v. Dillingham*, 688 F.2d 1367, 1373 (11th Cir. 1982) (*en banc*), for the proposition that a plan is "established" if, "from the surrounding circumstances a reasonable person could ascertain" the following four elements: "the intended [i] benefits, [ii] beneficiaries, [iii] source of financing, and [iv] procedures for receiving benefits." [30]

On February 2, 1982, ALPA and TACA entered a "Letter of Agreement" in which they agreed to establish a retirement plan for all TACA pilots. However, a formal retirement plan was not implemented until April 18, 1985, when TACA and ALPA executed the "TACA International Air Lines, S.A. Pilots' Retirement Plan and Trust" (the Plan). The 1982 "Letter of Agreement" provided that TACA would contribute $75,000 a year to a fund for the pilots' retirement plus a variable amount depending upon the number of pilots listed on the seniority list and whether a second B-737 aircraft was acquired. TACA's obligation to make monthly contributions commenced on March 31, 1982. "[U]ntil such

time as the retirement plan for pilots has been established and implemented," TACA's contributions were to be deposited in an institution named by ALPA to be held in trust for the benefit of the retirement plan. The "Letter of Agreement" was effective from February 25, 1982 to February 25, 1987, at which time the agreement would be subject to renewal.

Since the 1982 agreement did not describe the intended benefits or procedure for receipt of benefits, (although it does impart the source of financing and the beneficiaries), ALPA argues that there was no plan until the signing of the 1985 retirement plan, which satisfies all four of the *Dillingham* requirements.[31]

Our opinion in no way undermines *Dillingham*'s holding that a plan is established if "from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits." *Id.* at 1373. But in our case the issue is not *if* a plan has been established, as in *Dillingham*, (because it is undisputed that an ERISA-covered plan was eventually established), but rather *when* the plan was established, taking into consideration the retroactivity provision in the 1985 retirement plan.[32]

ALPA also argues that the "circumstances" surrounding the February, 1982 Letter of Agreement, as reflected in its terms, prove that a plan was not established at that time. In particular, ALPA points to the following language of the 1982 Agree-

2797–98, 69 L.Ed.2d 672 (1981); *United Independent Flight Officers, Inc. (UIFO–I)*, 756 F.2d 1262, 1266–69; *Moore v. Reynolds Metal Co. Retirement Program*, 740 F.2d 454, 456 (6th Cir.1984) *cert. denied*, 469 U.S. 1109, 105 S.Ct. 786, 83 L.Ed.2d 780 (1985).

**29.** *UIFO–I*, 756 F.2d at 1268; *United Independent Flight Officers, Inc. v. United Air Lines, Inc.*, 756 F.2d 1274, 1280 (7th Cir.1985); *Sutton v. Weirton Steel Division of National Steel Corp.*, 567 F.Supp. 1184, 1201 (N.D.W.Va.), *aff'd*, 724 F.2d 406 (4th Cir.1983), *cert. denied*, 467 U.S. 1205, 104 S.Ct. 2387, 81 L.Ed.2d 345 (1984).

**30.** *Accord Rasmussen v. Metropolitan Life Ins. Co.*, 675 F.Supp. 1497, 1500 (W.D.La.1987); *Ogden v. Michigan Bell Telephone Co.*, 657 F.Supp.

328, 332 n. 3 (E.D.Mich.), *appeal dismissed*, 829 F.2d 1126 (6th Cir.1987).

**31.** In *Dillingham*, an *en banc* Eleventh Circuit held that employers and unions that subscribed to a group insurance trust to furnish health insurance for employees or members, "established employee welfare benefit plans" for purposes of deciding subject matter jurisdiction over ERISA claims. *Dillingham*, 688 F.2d at 1374.

**32.** Of course, this distinction can easily be collapsed by recognizing that a plan is normally established *when* all of the requirements for a plan are met. But the distinction is useful here because there is no contention that all of the requirements for a plan were met by 1985.

ment to support its claim that a pension plan was to be created at some time in the future, and not by the 1982 Agreement itself: "the specifics of the retirement plan for the pilots *shall be* determined ...."; TACA's contributions would be held in trust *"until such time as the retirement plan for pilots has been established and implemented"*; and "[a]t that time the Company's required monthly contributions shall be made to the retirement plan for pilots." (Emphasis added by ALPA).[33]

**33.** The more complete version of relevant provisions of the 1982 Agreement are as follows:

LETTER OF AGREEMENT
between
TACA INTERNATIONAL AIRLINES, S.A.
and
THE AIR LINE PILOTS
in the service of
TACA INTERNATIONAL AIRLINES, S.A.
as represented by
THE AIR LINE PILOTS ASSOCIATION
INTERNATIONAL

THIS LETTER OF AGREEMENT is made and entered into in accordance with the provisions of the Railway Labor Act as amended, by and between TACA INTERNATIONAL AIRLINES, S.A. (hereinafter referred to as the "Company") and the AIR LINE PILOTS in the services of TACA INTERNATIONAL AIRLINES, S.A. as represented by the AIR LINE PILOTS ASSOCIATION, INTERNATIONAL (hereinafter referred to as the "Association").

\* \* \* \* \* \*

1. The Company will fund a retirement plan for all pilots of the Company on the seniority list as of February 1, 1982 and any pilots added to the seniority list thereafter. The Company contributions to the plan shall be as follows:

(a) $75,000 per year, and

(b) an additional $25,000 per year when second B–737 aircraft is acquired by (i.e. owned by or leased to) the Company, and

(c) an additional $2,000 per year for each pilot on the seniority list in excess of fifty (50) pilots and

(d) all obligations coming due under clauses (a), (b), and (c) above will be paid by 12 payments 1/12 each such payments on the last business calendar day of the month and each such payments prorated to any increased obligation.

\* \* \* \* \* \*

5. The specifics of the retirement plan for pilots shall be determined by the Association provided that the plan receives I.R.S. qualification and it treats all pilots in a fair and equitable manner.

6. The Company contributions required by Paragraphs 1 and 4 above shall be deposited in a trust account established in an institution

We can ignore the implications of these terms in the 1982 Letter of Agreement, however, because the April, 1985 retirement plan is explicitly retroactive to February, 1982. The very first sentence of the 1985 retirement plan states that TACA "established a pension plan for its Pilots" on February 1, 1982.[34] The retirement plan unambiguously marks the plan's Effective Date as February 1, 1982.[35] All pilots employed on the Effective Date are eligible to

to be named by the Association to be held in trust by that institution for the benefit of the retirement plan for pilots until such time as the retirement plan for pilots has been established and implemented. At that time the Company's required monthly contributions shall be made to the retirement plan for pilots.

\* \* \* \* \* \*

**34.** Article 1.1 of the TACA INTERNATIONAL AIRLINES, S.A. PILOTS RETIREMENT PLAN AND TRUST provides:

*Establishment and Name of the Plan and Trust*—TACA INTERNATIONAL AIRLINES, S.A., (hereinafter referred to as the "Company"), on February 1, 1982, established a pension plan for its Pilots, which, as it may be amended from time to time, is known as the TACA International Airlines, S.A. Pilots Retirement Plan and Trust.

**35.** Article II—(Definitions) defines "Effective Date":

The term 'Effective Date' means February 1, 1982, the date on which the provisions of this Plan are effective.

Other provisions support the view that the 1985 Plan is retroactive to 1982. "Future Service" is defined as "a Pilots" aggregate period of employment as a Pilot on or after February 1, 1982, including approved leaves of absence and furloughs."

"Past Service" is defined as "a Pilot's aggregate period of employment as a Pilot prior to February 1, 1982, including approved leaves of absence and furloughs; provided, however, that a Pilot's total Past Service which may be credited under the Plan shall not exceed twenty (20) years."

"Plan Year" is defined as "the twelve (12) month period commencing each January 1st and ending on the following December 31st. However, the first Plan Year shall commence February 1, 1982 and end December 31, 1982."

*4.1 Company Contributions*—The Company shall contribute to the Plan such amounts as shall be required by the Letter of Agreement between TACA INTERNATIONAL AIRLINES, S.A. and the AIR LINE PILOTS in the service of TACA INTERNATIONAL AIR-

participate in the Plan.[36] We will not interfere with the intent of the parties to make the Plan effective on February 1, 1982. Thus, we instruct the court on remand to accept as a matter of law that the Plan was in effect on February 1, 1982.

### B. Did TACA, ALPA and Huttinger Have Any Fiduciary Duties Under the Retirement Plan?

Finding a need for greater protection of employees covered by benefit plans, Congress enacted ERISA in 1974. 29 U.S.C. §§ 1001 *et seq.* In so doing, Congress sought to protect "the interests of participants in private pension plans and their beneficiaries by improving the equitable character and the soundness of such plans." 29 U.S.C. § 1001(c).[37] ERISA is therefore to be construed liberally to safeguard the interests of fund participants and beneficiaries, and to preserve the integrity of fund assets. This court has previously held that a liberal construction of ERISA is in keeping with its remedial purposes.[38]

■ Section 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), provides that a "person" is a fiduciary only "to the extent" he

(1) exercises discretionary control or authority over the management of the Plan or the Plan's disposition of its assets, (2) renders investment advice with regard to assets of the plan, or (3) has discretionary authority or responsibility in the administration of the plan."

In *Sommers Drug Stores, Co. Employee Profit Sharing Trust v. Corrigan Enterprises, Inc.*, 793 F.2d 1456, 1459–60 (5th Cir.1986), *reh'g den.*, 797 F.2d 977 (5th Cir.1986) *cert. denied*, 479 U.S. 1034, 107 S.Ct. 884, 93 L.Ed.2d 837 (1987), we held that "[t]he phrase 'to the extent' indicates that a person is a fiduciary [under ERISA] only with respect to those aspects of the plan over which he exercises authority or control."[39] The court below applied 3(21)(A) and *Sommers* to conclude that neither TACA nor ALPA had any fiduciary duties "because the 1985 retirement plan does not establish any power or authority on behalf of TACA or ALPA, nor has any such authority or power been demonstrated to have been exercised in fact." *Landry v. ALPA*, No. 86–3196, slip op. at p. 9 (E.D.La. Apr. 24, 1987) (mem.). A genuine issue of material fact[40] existed as to whether TACA, ALPA, and Huttinger had any fiduciary duties under ERISA that

LINES, S.S. as represented by THE AIR LINE PILOTS ASSOCIATION, INTERNATIONAL in effect as of February 24, 1982 and as subsequently amended or replaced, in accordance with the funding standards of the Internal Revenue Code and ERISA.

36. However, one year of service is required before eligibility:

*3.1 Eligibility*—Each person who is employed as a Pilot on the Effective Date and who, as of the Effective Date, has completed one year of Past Service, shall participate in this Plan as of the Effective Date.

37. Amending ERISA in 1986 with the Single–Employer Pension Plan Amendments Act, (SEPPAA) Title XI of Pub.L.No. 99–272, tit. XI, 100 Stat. 237 (1986), Congress declared that the policy of the legislation was "to increase the likelihood that participants and beneficiaries under single-employer defined benefit pension plans will receive their full benefits." 29 U.S.C. § 1001b(c)(3) (Supp. VII 1989). Another declaration of policy under SEPPAA was "to provide for the transfer of unfunded pension liabilities onto the single-employer pension plan termination insurance system only in cases of severe

hardship." 29 U.S.C. § 1001b(c)(4) (Supp. VII 1989).

38. *American Federation of Unions Local 102 Health & Welfare Fund v. Equitable Life Assurance Society of the United States*, 841 F.2d 658, 662 (5th Cir.1988); *Donovan v. Mercer*, 747 F.2d 304, 308 (5th Cir.1984).

39. *Accord Gelardi v. Pertec Computer Corp.*, 761 F.2d 1323, 1325 (9th Cir.1985); *Brandt v. Grounds*, 687 F.2d 895, 897 (7th Cir.1982); *Holland v. Bank of America*, 673 F.Supp. 1511, 1518 (S.D.Cal.1987).

40. In a practice all too common in summary judgment decisions, the trial court made no mention of the standard it was applying to reach its decision. Assuming that the appropriate standard for a rule 56(c) motion was being tacitly applied, it would behoove the district court to spell out that "no genuine issues as to any material fact" could be found in support of plaintiff's case. F.R.Civ.P. 56(c). *See also*, S. Childress & M. Davis, *Standard of Review* 310 (Wiley & Sons 1986). Such judicial pedagogy might reduce the frequency of the same omission in briefs, motions, etc.

would make them liable for the wrongs alleged in the pilots' complaint.

Initially, we must emphasize that fiduciary status is to be determined by looking at the *actual* authority or power demonstrated, as well as the formal title and duties of the party at issue. As described in the legislative history of ERISA, "the definition [of 'fiduciary'] includes persons who have authority and responsibility with respect to the matter in question, regardless of their formal title." H.R.Conf.Rep. No. 93–1280, 93d Cong., 2nd Sess., *reprinted in* 1974 U.S.Code Cong. & Admin.News 4639, 5038, 5103. Thus "fiduciary" should be defined not only by reference to particular titles such as "plan administrator," "committee chairman," or "sponsor," but also by considering the authority which a particular person or entity exercises over the employee benefit plan at issue. *Donovan v. Mercer*, 747 F.2d at 308. *See also Brink v. DaLesio*, 496 F.Supp. 1350, 1374–75 (D.Md.1980), *rev'd in part on other grounds*, 667 F.2d 420 (4th Cir.1982); *Leigh v. Engle*, 727 F.2d 113, 134 n. 33 (7th Cir.1984) ("we think ERISA directs courts to look beyond ... formal authority with respect to the plan ... to consider what real authority they had over plan investments ...").

The fact that someone is a fiduciary under a retirement plan does not necessarily mean he is a fiduciary with respect to all of the obligations under the plan. As we stressed in *Sommers*, 793 F.2d at 1459, the key language in the statutory definition is that a person is a fiduciary "to the extent" he or she exercises control over the plan. The Secretary of Labor explained this language in a bulletin interpreting ERISA, which was published in the Code of Federal Regulations. In this bulletin, the Secretary was asked the following question and gave the following response:

D–4 Q: In the case of a plan established and maintained by an employer, are members of the board of directors of the employer fiduciaries with respect to the plan?

A: Members of the board of directors of an employer which maintains an employee benefit plan will be fiduciaries only to the extent that they have responsibility for the functions described in section 3(21)(A) of the Act. For example, the board of directors may be responsible for the selection and retention of plan fiduciaries. In such a case, members of the board of directors exercise "discretionary authority or discretionary control respecting management of such plan" and are, therefore, fiduciaries with respect to the plan. *However, their responsibility, and consequently, their liability, is limited to the selection and retention of fiduciaries* (apart from co-fiduciary liability arising under circumstances described in section 405(a) of the Act). In addition, if the directors are made named fiduciaries of the plan, their liability may be limited pursuant to a procedure provided for in the plan instrument for the allocation of fiduciary responsibilities among named fiduciaries or for the designation of persons other than named fiduciaries to carry out fiduciary responsibilities, as provided in section 405(c)(2).

The Internal Revenue Service notes that it would reach the same answer to this question under section 4975(e)(3) of the Internal Revenue Code of 1954.

ERISA Interpretive Bulletin 75–8, 29 CFR § 2509.75–8 (1983) (emphasis supplied).

While the fiduciary duty of a board of directors is not directly at issue in our case, the excerpted dialogue from the bulletin illustrates the important parameters and limitations of fiduciary responsibility. Thus, it will be the task of the court on remand to determine precisely the extent, as a factual matter, of *actual* fiduciary authority *possessed* or *exercised* by ALPA, Huttinger, and TACA with respect to the wrongs alleged by the pilots. The pilots' complaint maintains the following four wrongs as a consequence of ERISA violations: [41]

(i) delay in implementation of the retirement plan for three years; (ii) failure and

---

**41.** Of course, to the extent the district court allows the pilots to amend their complaint on remand pursuant to F.R.Civ.P. 15, this list of alleged wrongs may be expanded.

refusal to discuss or disclose the Plan and its benefits to the Pilots upon repeated requests; (iii) failure to disclose the amount of contributions by TACA, where the funds were deposited, the type of investment account and interest rates the invested funds received; and (iv) collusion between TACA, ALPA, and FBA to allow Huttinger to receive benefits to which he was not legitimately entitled.[42]

### 1. Too Slow

Although, as we determined above, the Plan was in effect in February, 1982, a detailed retirement plan laying out the rights and obligations of the parties was not implemented until over three years later.[43] In August of 1984, FBA was contacted by ALPA about a possible contract to perform retirement plan services. On October 30, 1984, a Plan Services Agreement was entered between ALPA and FBA delineating specific services that FBA would provide under the Plan. In this Plan Services Agreement, FBA agreed to take "all the steps required to make the plan and trust operative."

However, while FBA's duties under the Plan are retroactive to February, 1982, any fiduciary obligations undertaken by FBA in the Plan Services Agreement do not begin until October 30, 1984. Thus, assuming without deciding that FBA had a fiduciary duty to implement the Plan beginning on October 30, 1984, there is still a disputed fact issue as to which party had the responsibility to implement the Plan from February, 1982 until the signing of the Plan Services Agreement.[44] If the trial court on remand discovers that TACA, ALPA, or Huttinger formally possessed or actually assumed any fiduciary duty with respect to implementing the Plan, then they will be potentially liable for any damages resulting from the delay in implementation.

### 2. Didn't Show

The pilots' alleged that Charles Huttinger refused to discuss or disclose the Plan and details about its benefits despite repeated requests. Huttinger was appointed to the pilots' retirement committee which, according to section 12.4 of the Plan,[45] was charged with interpreting and construing the Plan, determining questions of eligibility and rights of participants and their beneficiaries, and providing guidelines for the plan administrator as required for the orderly and uniform administration of the Plan.

The affidavit of Bert Haffner, one of the TACA pilots, declares that Huttinger "refused to supply [him] with a copy of the retirement plan or tell [him] how to get one" despite repeated requests. R. 1179. In July or August of 1985, Haffner met with Huttinger at his home "in order to obtain his help in applying for all benefits [that he] might be eligible for." R. 1180. Haffner claimed that he "did this in accordance with recommendations in ALPA manuals, to contact the union chairman for help in applying for benefits." R. 1180.

Another pilot, Jules Corona, declared that despite numerous requests, he "was never given any information as to where the TACA contributed retirement funds were held in Trust, nor when the plan was implemented, nor any of the ERISA required disclosure information until after

---

**42.** FBA is only an intervenor in this appeal. See *infra.* The original Complaint alleged collusion between ALPA, FBA, and Huttinger. The amended Complaint, however, implicates TACA in this collusion to improperly provide Huttinger with funds.

**43.** In an inquiry filed with the U.S. Department of Labor, Division of Technical Assistance, Bert Haffner, one of the plaintiff TACA pilots, complained of an "unusual time delay and lapse from time of inception (1 Feb 82) to the time of issuance of plan outline (16 April 85)." R. 1183.

**44.** There is nothing in either the "Letter of Agreement" or the Plan itself that imposes a fiduciary duty to implement the Plan.

**45.** 12.4 *Retirement Committee*—In order to assist in the administration of the Plan, the Association shall appoint a Retirement Committee to:
 (a) interpret and construe the Plan;
 (b) determine questions of eligibility and of rights of Participants and their Beneficiaries;
 (c) provide guidelines for the Plan Administrator, as required for the orderly and uniform *administration of the Plan.*

the August 1, 1985 termination date of the plan." R. 303.

Huttinger clearly assumed both a *de facto* and a *de jure* role in construing the Plan and informing the pilots about its contents. Thus, we find as a matter of law that Huttinger had a fiduciary duty to disclose information about the Plan to the pilots when asked. Whether he breached that fiduciary duty must be resolved on remand.

### 3. Couldn't Know

ALPA argues that it is not a fiduciary with respect to the alleged failure to disclose information about the Plan and its assets because the Plan charged the Plan Administrator, FBA, with the day-to-day administration of the Plan, and consistent with Section 101 of ERISA, 29 U.S.C. § 1021,[46] with specific responsibility for providing participants in the Plan with all information required by law, including information and reports regarding the Plan and its assets.[47]

However, while the responsibility for notifying beneficiaries and participants with Plan information formally fell upon FBA, there are indications that FBA's actual authority over Plan matters was (at least sometimes) subordinated to and dependent upon decisions by ALPA.[48] For example, when the president of FBA, Richard Watson, was asked why Huttinger was able to apply for and begin receiving benefits in November of 1985, but Haffner was not allowed to do the same, Watson reportedly explained "that was the way ALPA had told him to do it."[49]

Even if the actual fiduciary duty to disclose information about the Plan falls upon FBA, its failure to notify Plan participants

---

**46.** § 1021. Duty of disclosure and reporting
(a) Summary plan description and information to be furnished to participants and beneficiaries
The administrator of each employee benefit plan shall cause to be furnished in accordance with section 1024(b) of this title to each participant covered under the plan and to each beneficiary who is receiving benefits under the plan—
(1) a summary plan description described in section 1022(a)(1) of this title; and
(2) the information described in section 1024(b)(3) and 1025(a) and (c) of this title.

**47.** Formal responsibility to notify beneficiaries and participants about the Plan falls on FBA.
9.8 *Powers, Duties and Responsibilities of the Plan Administrator*—The specific powers and responsibilities of the Plan Administrator are to:
\* \* \* \* \* \*
(c) Prepare and arrange for delivery to Participants such summaries, descriptions, announcements and reports as are required to be given to Participants under applicable laws and regulations;
Our opinion decides nothing with respect to FBA. See *infra*.

**48.** The Plan plainly gives ALPA some fiduciary duties. Article 11.2 of the Plan gives ALPA the authority to terminate the plan and the trust by an instrument in writing signed by the president of ALPA or his designee for such purpose. R. 1389.
Article 11.2 provides:
Termination of Plan and Trust—"This Plan and Trust may be terminated by an instrument in writing signed by the President of the Association or his designee for such purpose. Notwithstanding the foregoing, the Plan shall automatically terminate in the event of a complete discontinuance of contributions by the Company. Upon the termination or partial termination of the Plan, the rights of all affected Participants and Beneficiaries to benefits accrued to the date of such termination, partial termination, or discontinuance, to the extent funded as of such date, are nonforfeitable."
ALPA has the sole authority and control to remove and appoint the Trustee, the Plan Administrator and the Investment Manager.
Article 9.5(a) provides: The Association is empowered to appoint and remove the Trustee, the Plan Administrator and the Investment Manager as it deems necessary for the proper administration of the Plan, to assure that the Plan is being operated for the exclusive benefit of the Participants and their Beneficiaries in accordance with the terms of this Agreement, the Internal Revenue Code and ERISA.
Article 9.5(c) explicitly provides for the discretion of ALPA:
"The Association may in its discretion appoint an Investment Manager to manage all or a designated portion of the assets of the Plan. In such event, the Trustee shall follow the directives of the Investment Manager in investing the assets of the Plan managed by the Investment Manager. While there is an Investment Manager, the Association shall have no obligation under this Plan with regard to the performance or non-performance of the duties delegated to the Investment Manager."

**49.** Bert Haffner provided this information about his conversation with Watson. R. 1181.

and beneficiaries may not constitute a breach of that duty because ALPA and TACA undertook an obligation to keep FBA informed about certain matters.[50] If ALPA failed to do so, FBA may have been prevented from fulfilling its fiduciary duty to notify the beneficiaries and participants.

Similarly, in the Plan, TACA agrees to supply "full and timely information to the Plan Administrator on all matters relating to the compensation of all Participants, their periods of service, their retirement, death, disability or termination of employment, and such other pertinent facts as [FBA] may require."[51] However, any fiduciary duty on the part of TACA arising under § 9.9 (or any other section) of the Plan is unenforceable, because TACA is neither a signatory nor a party to the Plan.[52]

The trial court on remand must determine the actual fiduciary duties assumed by ALPA and TACA with respect to providing FBA and the Plan beneficiaries and

participants with information under the Plan.[53]

### 4. Where'd the $ Go?

A genuine issue of material fact exists as to whether TACA and ALPA colluded with Huttinger in order to provide him with retirement benefits. As discussed *supra*, Frank Landry declared in an affidavit that each party to the alleged collusion was motivated by different factors. According to Landry, TACA threatened civil suit and criminal prosecution against ALPA for the intentional damage of TACA's engines by some of the ALPA pilots.[54] In return for ALPA's accepting the 1986 Pilots' Agreement, TACA agreed not to carry out this threat. TACA, meanwhile, would be able to move its pilot base to El Salvador and avoid its obligations under the Plan.

Landry further claimed that Huttinger was offered benefits to which he would otherwise not have been entitled as an incentive for him to vote against the

---

**50.** Sections 3 and 4 of the Plan Services Agreement provide in full:

3. *Obtaining Information*—The Association agrees to furnish information or data which FBA requests in order to perform services under this Agreement within 90 days of the initial request or FBA will not be held responsible for services under this Agreement. FBA reserves the right to require that data be furnished over the signature of an authorized official of the Association or the entity or representative providing the data on behalf of the Association.

FBA reserves the right to reject information or data which it considers unsuitable for processing. FBA's sole responsibility, in this regard, shall be to forward questionnaires and forms as necessary to the Association on a timely basis, enabling the Association to provide the information needed.

4. *Liability for Information*—The Association shall provide complete, accurate and timely information, upon which information FBA may rely fully. The Company and the Association shall indemnify and hold FBA harmless for errors, omissions, and inaccurate or incomplete reports completed, based on inaccurate, incomplete or untimely information furnished by the Company and the Association.

**51.** Plan § 9.9 provides:

9.9 *Information From Company*—To enable the Plan Administrator to perform his functions, the Company shall supply full and timely information to the Plan Administrator on

all matters relating to the compensation of all Participants, their periods of service, their retirement, death, disability, or termination of employment, and such other pertinent facts as the Administrator may require; and the Administrator shall advise the Trustee and the Investment Manager of such of the foregoing facts as may be pertinent to their duties under the Plan. Subject to Section 9.2, all fiduciaries may rely upon such information as is supplied by the Company and shall have no duty or responsibility to verify such information.

**52.** Merely because TACA was not a party to the Plan does not preclude a finding that TACA was a fiduciary with respect to the Plan. If further facts discovered on remand reveal that TACA undertook actual obligations to notify in accordance with § 9.9 of the Plan, then TACA will be a fiduciary to that extent. *See* Section *II.B.4. Where'd the $ Go?*

**53.** In a memorandum responding to ALPA's motion to dismiss, FBA, a defendant below, admitted that "[a] factual determination is required to determine whether those disclosures [pertaining to the Plan] were made." FBA also asserted: "Factual determinations abound in the delegation issue, pretermitting summary judgment on that basis." R. 1191.

**54.** These allegations are discussed more fully in the RICO section, *infra*.

pilots' interests. If such collusion did occur, then TACA, ALPA, and Huttinger are implicated as fiduciaries under 3(21)(A) because they would have exercised actual control over the disposition of the assets of the Plan. In other words, by allegedly colluding to provide Huttinger with retirement benefits, ALPA, TACA, and Huttinger *became* fiduciaries over the distribution of Plan funds, even if they are not listed as fiduciaries with respect to that function.

## C. Breach of Fiduciary Duties

Plan fiduciaries are statutorily prohibited from dealing with Plan assets in their own interest.[55] Moreover, the Plan fiduciaries agreed to "discharge [their] duties solely in the interest of the Participants and their Beneficiaries" and to act "for the exclusive purpose of providing benefits to Participants."[56] To the extent that ALPA and TACA colluded with Huttinger to provide the latter with Plan benefits, so that the former could serve their own interests, fiduciary duties were breached under § 1106(b).

Moreover, we must stress that although *Sommers* limited the liability of fiduciaries by the "to the extent" language of § 3(21)(A) this limitation does not apply to § 1105(a).[57] To illustrate, even if ALPA is only found to be a fiduciary "to the extent" of appointing and removing the Plan ad-

55. § 1106. *Prohibited transactions*
 \* \* \* \* \* \*
 (b) Transactions between plan and fiduciary A fiduciary with respect to a plan shall not—
 (1) deal with the assets of the plan in his own interest or for his own account,
 (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or
 (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan. 29 U.S.C. § 1106(b).

56. Article 9.2 provides in relevant part:
 *General Fiduciary Duties*—Each Plan fiduciary will discharge his duties solely in the interest of the Participants and their Beneficiaries and act: (a) for the exclusive purpose of providing benefits to Participants and their Beneficiaries and defraying reasonable expenses of administering the Plan; (b) with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; ... No Plan fiduciary shall engage in any transaction prohibited under ERISA, the Internal Revenue Code, or any other law."
 This Plan language follows the terms of the ERISA provision on the standard of care for fiduciaries:
 § 1104. *Fiduciary duties*
 (a) Prudent man standard of care
 (1) Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
 (A) for the exclusive purpose of:

 (i) providing benefits to participants and their beneficiaries; and
 (ii) defraying reasonable expenses of administering the plan;
 (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;
 (C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and
 (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter or subchapter III of this chapter.
 29 U.S.C. § 1104(a).

57. § 1105. *Liability for breach of co-fiduciary*
 (a) Circumstances giving rise to liability
 In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
 (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
 (2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
 (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.
 29 U.S.C. § 1105(a).

ministrator and Trustee,[58] ALPA may still be liable, for example, for the breaches of FBA if ALPA "participat[ed] knowingly in, or knowingly undert[ook] to conceal, an act or omission of [FBA], knowing such act or omission [was] a breach." § 1105(a)(1).

### D. Status of FBA

The pilots' case against FBA is still pending in the district court. FBA has moved for summary judgment against the pilots' claims, but the trial court has not decided the motion.[59] Although the decision appealed herein does not directly address FBA's fiduciary status or liability, FBA has filed an intervenor brief seeking to protect its interest in the litigation. Basically, FBA appears to be concerned that since the trial court found that TACA and ALPA were not fiduciaries, and dismissed the claim against Huttinger, the only party remaining upon which fiduciary duty can be imposed is FBA.

Thus, in its intervenor brief FBA argues that a determination of whether TACA or ALPA acted in accordance with the fiduciary provisions of ERISA is neither necessary nor relevant. FBA asserts that allegations of improper plan termination do not raise any ERISA issues—but rather involve the RLA—since plan termination is a mandatory subject of collective bargaining under the RLA. FBA also claims that the Plan should be placed into trusteeship by voluntary action of the Pension Benefits Guarantee Corporation (PBGC).

FBA's arguments are unconvincing. The ERISA claim against ALPA and TACA on which the Court below ruled—the only ERISA ruling before us on appeal—only concerned action taken *prior* to Plan termination. Because the District Court's ruling properly confined itself to the claims before it, and did not address any ERISA claim related to Plan termination, there is no

ERISA "finding" related to Plan termination which we could reverse. FBA's request actually asks us to become a factfinder *ab initio*, a role which does not properly rest with this Court. *Booker v. School Dist. No. 1*, 585 F.2d 347, 353 (8th Cir.1978) ("function of the appellate court is not to make an initial decision [on factual issues] but simply to review the action of the trial court."), *cert. denied*, 443 U.S. 915, 99 S.Ct. 3106, 61 L.Ed.2d 878 (1979).

Moreover, arguments by FBA that it should initiate proceedings against PBGC for ancillary relief under the insurance guaranty provisions of ERISA are not relevant to the issue of whether TACA, ALPA, or Huttinger had any fiduciary duties under the Plan. An August 10, 1988 letter from the PBGC to the president of FBA stated that the notification given to the pilots was insufficient, and that the Plan was an ongoing plan until properly terminated. According to the PBGC letter, TACA is required to meet the minimum funding standards under § 302 of ERISA and § 412 of the Internal Revenue Code as long as the Plan is ongoing. Thus, while the pilots may ultimately choose to seek relief from the PBGC, FBA cannot force it to take this approach.

In sum, when summary judgment was granted on the ERISA claims, the record contained disputed issues of material fact regarding the fiduciary status of the defendants with respect to the wrongs alleged in the complaint. We remand to the trial court for a determination not inconsistent with this opinion.

### IV. RICO CLAIMS

In their amended complaint, pilots sought treble damages from TACA, ALPA and Huttinger under two subsections of RICO.[60] We must determine whether

---

**58.** This example is only an illustration to assist the trial court on remand; it reaches no conclusions.

**59.** In expectation of an appellate opinion that would be forced to explicitly or implicitly discuss the fiduciary status and liability of FBA, the trial court may, wisely, be waiting for our decision before ruling on FBA's motion for sum-

mary judgment. An obvious possibility is to consolidate this remanded action with the FBA action.

**60.** 18 U.S.C. § 1962. Prohibited Activities:

(b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to ac-

TACA, ALPA, and Huttinger showed there were no genuine issues of material fact concerning the existence of (i) a RICO *person,* (ii) predicate acts of *racketeering activity,* (iii) a *pattern* of racketeering activity, and (iv) an *enterprise.*[61] The absence of a fact issue regarding any one of these elements is sufficient to grant summary judgment provided the legal analysis also favors the movants.

The trial judge granted summary judgment against the pilots. In brief, he found that if any predicate acts occurred, they took place before the alleged RICO enterprise came into being. Additionally, none of the alleged predicate acts were found sufficient for the RICO claim.[62] The trial court did find that a "pattern" of racketeering activities was alleged,[63] but held that there was no enterprise because plaintiffs failed to allege the appropriate "continuity" under either of its enterprise theories.

Our review of a grant of summary judgment is *de novo.*[64] The standards for granting or denying summary judgment are well known.

The party seeking summary judgment bears the exacting burden of demonstrating that there is no actual dispute as to any material fact in the case.... In assessing whether the movant has met this burden, the courts should view the evidence introduced and all factual inferences from that evidence in the light most favorable to the party opposing the motion.... All reasonable doubts about the facts should be resolved in favor of the non-moving litigant.... A court must not decide any factual issues it finds in the record, but if such are present, the court must deny the motion and proceed to trial.... If reasonable minds might differ on the inference arising from undisputed facts, then the court should deny summary judgment.[65]

Appropriate summary judgment evidence consists of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any." F.R.Civ.P. 56(c). The affidavits must be made on "personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." F.R.Civ.P. 56(e). Finally, once the movant has made and supported its motion as provided in this rule, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." *Id.*

---

quire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.
(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

**61.** *Delta Truck & Tractor, Inc. v. J.I. Case Co.,* 855 F.2d 241, 242 (5th Cir.1988), *cert. denied,* — U.S. —, 109 S.Ct. 1531, 103 L.Ed.2d 836 (1989) ("Reduced to its three essentials, a civil RICO claim must involve: (1) a *person* who engages in (2) a *pattern of racketeering activity* (3) connected to the acquisition, establishment, conduct, or control of an *enterprise.*"); *see also Gray v. Cauble,* 849 F.2d 946, 949 n. 7 (5th Cir.1988) (test for § 1962(c)); *Moss v. Morgan Stanley, Inc.,* 719 F.2d 5, 17 (2d Cir.1983), *cert.*

*denied,* 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984) (test for § 1962(a)–(c)).

**62.** For the specifics as to the trial court's disposition of each of the alleged predicate acts, *see infra* Part IV. B.

**63.** In making this ruling, the trial court was constrained by *R.A.G.S. Couture, Inc. v. Hyatt,* 774 F.2d 1350 (5th Cir.1985), although it made an effort to show why no pattern should be found in this circumstance.

**64.** *Impossible Electronics Techniques, Inc. v. Wackenhut Protective Systems, Inc.,* 669 F.2d 1026, 1030 (5th Cir. Unit B 1982) ("In reviewing a decision granting or denying summary judgment, this court applies the same legal standards as those that control the district court in determining whether summary judgment is appropriate.") (Citations omitted).

**65.** *Id.* at 1031 (citations omitted).

### A. The RICO Persons

The Fifth Circuit recently clarified the definition of the RICO "person"—the defendant—in *Delta Truck & Tractor, Inc. v. J.I. Case Co.*[66]

> If we are to restrict RICO to the type of conduct Congress intended to proscribe, the RICO person must be either one that poses or has posed a continuous threat of engaging in acts of racketeering.... The continuous threat requirement may not be satisfied if no more is pled than that the person has engaged in a limited number of predicate racketeering acts.

We are faced here with three RICO defendants and two theories of the enterprise[67] which configure them in different ways.

### 1. Association-in-fact Persons

Under pilots' "association-in-fact" enterprise theory, Huttinger, ALPA and TACA formed or acted as an enterprise, whose alleged purpose was to move the TACA pilot base, end ALPA's representation of the TACA pilots, ensure Huttinger's retirement benefits and ultimately deprive the pilots of their rights under the collective bargaining agreement. Under this enterprise theory, all three could be RICO defendants. According to pilots' allegations and affidavit evidence, those goals have been accomplished, so the enterprise no longer exists.[68] There are no RICO defendants under this theory.

### 2. ALPA-as-Enterprise Persons

■ The pilots' other enterprise theory regards ALPA as a lawful enterprise which was the vehicle for racketeering activities perpetrated by TACA and Huttinger. Under this theory, ALPA cannot be a RICO person—or defendant—for the § 1962(c) violation because in such a situation, "the 'person' and the 'enterprise' must be distinct."[69] The rationale for this distinction comes from the language of the statute which deals with a "person employed by or associated with any enterprise." 18 U.S.C. § 1962(c).[70] This language shows that Congress intended for the RICO person and the enterprise to be separate entities.

■ It would be incongruous here to find that while ALPA, as the enterprise, cannot be a RICO person, it can be held vicariously liable for the acts of Huttinger. If this were the rule, all legal enterprises could be found liable under RICO if their employees or agents were involved in perpetrating predicate acts through or against them. This is contrary to the rule Congress meant to impose as evidenced by the language of the statute. ALPA is thus not appropriately a defendant under this legal enterprise theory for purposes of the § 1962(c) violation, either as a RICO person or vicariously.

■ ALPA can be both the enterprise and a RICO defendant for the § 1962(b) violation. In contrast to the language of subsection (c) which "requires a *relationship* between the 'person' and the 'enterprise,' subsection[ ... ] (b) require[s] only the *use* of an 'enterprise' by a 'person.'"[71] Thus the RICO person and the enterprise need not be distinct for a person to be held liable under subsection (b). A finding of vicarious liability on the part of an enterprise which derived benefit from its representative's wrongful acts is also consistent with this view.[72]

---

**66.** 855 F.2d 241, 242 (5th Cir.1988), *cert. denied,* — U.S. —, 109 S.Ct. 1531, 103 L.Ed.2d 836 (1989).

**67.** Pilots' two enterprise theories are discussed in detail, *infra,* Part IV.D..

**68.** This is discussed in detail in Part IV.D., *infra.*

**69.** *Bishop v. Corbitt Marine Ways, Inc.,* 802 F.2d 122, 123 (5th Cir.1986); *see also Atkinson v. Anadarko Bank and Trust Co.,* 808 F.2d 438, 441 (5th Cir.), *cert. denied,* 483 U.S. 1032, 107 S.Ct. 3276, 97 L.Ed.2d 780 (1987).

**70.** The Fifth Circuit has adopted the rationale of the Seventh Circuit in this regard. *See Haroco v. American National Bank & Trust Co. of Chicago,* 747 F.2d 384, 400 (7th Cir.1984), *aff'd* 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985).

**71.** *Liquid Air Corp. v. Rogers,* 834 F.2d 1297, 1307 (7th Cir.1987), *cert. denied,* — U.S. —, 109 S.Ct. 3241, 106 L.Ed.2d 588 (1989).

**72.** *Id.*

 The continuing threat requirement must still be met. For purposes of the alleged subsection (c) violation, only TACA and Huttinger could be defendants. Pilots have not alleged that TACA constitutes or has constituted a continuing threat—it is not a RICO person. A fact issue exists as to whether Huttinger poses a continuing threat resulting from his receipt of retirement benefits. This turns on the fact issue which we find to exist, as to whether the receipt of these benefits constitutes mail fraud.

For purposes of the subsection (b) violation, pilots have alleged that ALPA poses a threat of continuing harm to other victims. As an example, they cite a suit against ALPA by Continental Airlines pilots making much the same allegations as the TACA pilots: ALPA sold them out to protect itself from prosecution for the acts of sabotage it directed. This allegation is unrefuted by any summary judgment evidence. Thus the allegation that ALPA poses a continuing threat of engaging in racketeering activities remains to be resolved. Likewise there is a fact issue as to whether Huttinger's receipt of retirement benefits is a continuation of racketeering activity.

Again, TACA is not a RICO person for purposes of this violation.[73]

### B. Racketeering Activity [74]

### 1. The Extortion Claim

 As one of the predicate acts of racketeering activity, the pilots claimed that TACA, ALPA and Huttinger committed extortion in violation of Louisiana state law[75] and 18 U.S.C. § 1951.[76] In support of these claims, the pilots alleged that Padgett, at the direction of Huttinger and ALPA, committed acts of sabotage against TACA aircraft and equipment to coerce concessions during negotiation of the collective bargaining agreement.

We agree with the trial court that these acts may not properly be considered predicate acts. The pilots did not allege that these extortionate acts were committed in the establishment or conduct of the affairs of an enterprise. If anything, they could only have been hostile to the goals of an alleged enterprise of which TACA and ALPA were both members.[77] Finally, the acts of sabotage are not actionable because the pilots did not allege or show that they sustained any injury as a result.[78] In fact,

**73.** Although we have found that TACA is not appropriately a RICO person—or defendant— for any of the alleged RICO violations, pilots' allegations of TACA's past wrongdoing will frequently be discussed in the remainder of this section. We will explain the effect of TACA's status where appropriate.

**74.** Racketeering activity is defined in relevant part as: (A) state law felonies; (B) acts indictable under several sections of 18 U.S.C. relating to, e.g., bribery (§ 201), embezzlement from pension and welfare funds (§ 664), mail fraud (§ 1341), wire fraud (§ 1343); (C) acts indictable under sections of 29 U.S.C. including violations of restrictions on payments and loans to labor organizations (§ 186) and embezzlement from union funds (§ 501(c)); and (D) offenses involving fraud under Title 11, in the sale of securities, etc. 18 U.S.C. § 1961(1).

**75.** The particular provision of Louisiana state law that was violated is not specified in the RICO case statement or the trial court's opinion.

**76.** 18 U.S.C. § 1951 Interference with commerce by threats or violence. "(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both."

**77.** This claim could not properly be raised under the ALPA-as-Enterprise theory in connection with the § 1962(c) claim since ALPA is not properly a defendant for that claim. *See supra* notes 68–70 and accompanying text.

**78.** *R.A.G.S. Couture, Inc. v. Hyatt,* 774 F.2d 1350, 1354 (5th Cir.1985) (*"Any* injury to business or property caused by a violation of 18 U.S.C. § 1962(c) is sufficient.) (Emphasis added). The Fifth Circuit derived this rule from *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 495, 105 S.Ct. 3275, 3284, 87 L.Ed.2d 346, 358 (1985), which held,

If the defendant engages in a pattern of racketeering activity in a manner forbidden by these provisions, and the racketeering activities injure the plaintiff in his business or property, the plaintiff has a claim under § 1964(c).

the sabotage, under the theory advanced by pilots, was intended to provide the pilots with an advantage in the form of bargaining concessions. It was not intended to deprive them of any rights.

### 2. The 29 U.S.C. § 186 Violation

The pilots alleged that ALPA made illegal payments to a labor official in violation of 29 U.S.C. § 186, which is section 302 of the LMRA.[79] In support of their claim, they provide the following facts. Huttinger suffered from a disability which prevented him from flying. The result of this should have been his removal from active status in late 1984, five years after he became disabled. Once removed from active status, he would not have been entitled to sick leave, to be on the priority list, or to represent ALPA in its negotiations with TACA. Yet Huttinger stayed on the seniority list, received sick leave benefits, represented ALPA in its negotiations with TACA, and received a $26,000 severance payment.

 There is no factual issue to be resolved regarding these allegations for two reasons. First, ALPA has produced affidavits and documents that we find establish as a matter of law that under its constitution and by-laws, Huttinger was properly on the "active" status list and therefore entitled to all the privileges of ALPA membership including the right to vote and hold office. Since the pilots presented no evidence to rebut this, ALPA has shown the absence of a material fact issue in this respect. Second, the LMRA makes it illegal for an employer to pay or lend money to a union that represents its employees and for the union to receive or demand such payments. However, the LMRA excludes from coverage RLA employers and employees.[80] Airlines and airline pilots come under the RLA.[81]

In response to the seemingly conclusory statutory disposition of this issue, pilots raise a subtle argument. Their theory is that TACA, ALPA, and Huttinger contractually converted themselves from RLA to LMRA coverage through the agreement by which TACA was relocated to El Salvador and the pilots were terminated. The district court rejected this argument, finding that TACA was not relieved of RLA obligations until September 1, 1985 which was after any enterprise that may have existed was dissolved. We agree that TACA was an RLA employer when the alleged LMRA violations occurred. Although TACA is not a RICO defendant, we must reach this issue to determine the status of Huttinger and ALPA, who were likewise subject to the RLA. Thus no predicate racketeering act is stated.

### 3. The Mail and Wire Fraud Claims

The pilots have described four acts which they allege constituted mail fraud and

79. 29 U.S.C. § 186 provides:
 (a) It shall be unlawful for any employer or association of employers or any person who acts as a labor relations expert, adviser, or consultant to an employer or who acts in the interest of an employer to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value—
 (1) to any representative of any of his employees who are employed in an industry affecting commerce; or
 (2) to any labor organization, or any officer or employee thereof, which represents, seeks to represent, or would admit to membership, any of the employees of such employer who are employed in an industry affecting commerce; or
 (3) to any employee or group or committee of employees of such employer employed in an industry affecting commerce in excess of their normal compensation for the purpose of causing such employee or group or committee

directly or indirectly to influence any other employees in the exercise of the right to organize and bargain collectively through representatives of their own choosing; or
 (4) to any officer or employee of a labor organization engaged in an industry affecting commerce with intent to influence him in respect to any of his actions, decisions, or duties as a representative of employees or as such officer or employee of such labor organization.
 (b)(1) It shall be unlawful for any person to request, demand, receive, or accept, or agree to accept, any payment, loan, or delivery of any money or other thing of value prohibited by subsection (a) of this section.

80. 29 U.S.C. §§ 142(3), 152(2), (3); see also United States v. Davidoff, 359 F.Supp. 545, 547–48 (E.D.N.Y.1973).

81. 45 U.S.C. § 182.

therefore predicate acts for RICO. (1) On July 3, 1985 Huttinger wrote the pilots to say negotiations between ALPA and TACA had broken down. He said that regardless of the outcome of the negotiations, TACA would have to contribute to the pension plan. TACA has not continued its contributions to the plan. (2) On July 24, 1985 Huttinger sent a letter and telegram to the pilots saying that TACA and ALPA had reached an agreement "subject to ratification." Pilots were not given the chance to ratify the agreement. (3) On August 3, 1985 TACA sent a letter to the pilots informing them that ALPA had agreed to the relocation of the pilot base to El Salvador. The pilots were given twelve days to decide to leave TACA and take severance pay or to move themselves and their families to El Salvador. This communication did not inform the pilots that their retirement fund would be terminated or that they needed to take certain actions to protect their eligibility to receive benefits. Pilots later learned that they had lost their right to receive benefits. (4) The pilots allege that illegal payments of severance pay and retirement benefits were made and are being made by mail to Huttinger in furtherance of the scheme to defraud the pilots.

The trial court disregarded the final allegation (No. (4)) on the grounds that it had not been pleaded with sufficient particularity to withstand F.R.Civ.P. 9(b).[82] It apparently found that the other allegations of mail fraud were insufficient, based upon its general finding that the alleged acts predated any possible enterprise.

■ We disagree with the trial court's characterization of the timing. These alleged acts of mail and wire fraud occurred during the negotiation process. ALPA was continuously in existence throughout this time so any acts that occurred or were alleged took place during the existence of the "ALPA-as-enterprise" enterprise.

■ The crime of mail fraud is committed when the mails are used as part of a scheme or artifice to defraud.[83] The elements of mail fraud as a predicate offense for civil RICO purposes are:

(1) A scheme or artifice to defraud or to obtain money or property by means of false or fraudulent pretenses, representation or promises.

(2) Interstate or intrastate use of the mails for the purpose of furthering or executing the scheme or artifice to defraud.

(3) The use of the mails by the defendant connected with the scheme artifice [sic] to defraud.

(4) Actual injury to the business or property of the plaintiff.[84]

The mail fraud statute proscribes two different offenses. The first is acting pursuant to a scheme or artifice to defraud. The second is acting pursuant to a scheme or artifice for the purpose of obtaining money or property by means of false or fraudulent pretenses, representations or promises.[85] Plaintiffs have alleged both types of schemes in this case.

**82.** This is discussed *infra; see* text accompanying notes 92–93.

**83.** 18 U.S.C. § 1341. Frauds and Swindles.
 Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, ... for the purpose of executing such scheme or artifice or attempting to do so, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

**84.** 1 D. McCormack, *Racketeer Influenced Corrupt Organizations* 4–46—4–47 (Knowles Law Book Publishing, Inc. 1989).

**85.** *Id.* at 4–47, *citing, United States v. Margiotta,* 688 F.2d 108, 121 (2d Cir.1982), *cert. denied,* 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983) ("The prohibition against schemes or artifices to defraud is properly interpreted to be independent of the clause 'for obtaining money or property.' ") (Citations omitted); *see also United States v. Townley,* 665 F.2d 579, 585 (5th Cir.), *cert. denied,* 456 U.S. 1010, 102 S.Ct. 2305, 73 L.Ed.2d 1307 (1982); *McLendon v. Continental Group, Inc.,* 602 F.Supp. 1492, 1507 (D.N.J. 1985).

First, they allege that TACA and Huttinger operating through and with the enterprise ALPA, schemed to achieve the relocation of TACA's pilot base to El Salvador.[86] Each of the participants had individual motivations for wishing the achievement of this end, but they all required the success of this common goal. In order to achieve their end, TACA, ALPA and Huttinger participated in a scheme to defraud the pilots of their jobs and pension benefits.[87] Reading the facts in the light most favorable to the pilots, the following steps could have occurred as part of this plan to defraud. The pilots were sent letters telling them that the plan would not be touched and was not a subject of the negotiations between TACA and ALPA. They were told that the agreement ultimately reached was "subject to ratification." They were not told that the agreement which was reached, and which actually did not require ratification by the membership, terminated their pension benefits at the time they had to decide between quitting (for severance pay) and relocating to El Salvador.

These misrepresentations, omissions [88] and false promises may have initially lulled the pilots into inaction. Based on these communications, they thought that Huttinger and ALPA were protecting their interests and they had no reason to question the system. Pilots allege that this correspondence ultimately had the effect of defrauding them of their jobs and pension benefits. TACA was able to relocate; ALPA was not prosecuted and was able to drop its representation of the TACA pilots; Huttinger received severance and retirement benefits. Only the pilots lost out. The intentional misrepresentations and omissions could have created a valuable undue advantage for TACA, ALPA and Huttinger [89] and thus constituted a scheme or artifice to defraud.[90]

Additionally, the defendants allegedly sought to obtain money or property by means of false or fraudulent pretenses, representation or promises. These are seen in their asserted motivations for their common goal of effecting the relocation and the benefits each received as a result. ALPA would save money by ridding itself of a small, yet costly, local union. It would also avoid the expense of defending against civil cases and criminal charges based on its alleged sabotage of TACA's planes. Huttinger would gain his severance pay and pension benefits.[91]

86. The pilots also alleged that the association-in-fact enterprise of ALPA, TACA, and Huttinger, which we find did not exist, had this goal.

87. The pilots have sufficiently alleged an intent to defraud, but even in the absence of such a showing, the intent to defraud is imputed to civil RICO defendants who act with reckless indifference to the truth or falsity of their representations. *United States v. Frick*, 588 F.2d 531, 536 (5th Cir.), *cert. denied*, 441 U.S. 913, 99 S.Ct. 2013, 60 L.Ed.2d 385 (1979); *see also United States v. Love*, 535 F.2d 1152, 1158 (9th Cir.), *cert. denied*, 429 U.S. 847, 97 S.Ct. 130, 50 L.Ed.2d 119 (1976); *United States v. Beecroft*, 608 F.2d 753, 757 (9th Cir.1979). If the misrepresentations, omissions and false promises alleged here were not intentional, then they were certainly reckless. The RICO defendants correctly state that under the mail fraud statute, the determination of what constitutes fraud is left largely to outside sources of law. *Parr v. United States*, 363 U.S. 370, 389, 80 S.Ct. 1171, 1182, 4 L.Ed.2d 1277, 1289 (1960). They are incorrect, however, in their position that such fraud must be found in the pilots' DFR, ERISA, LMRA, or conversion claims. Clearly the state common law of fraud may provide a source of substantive law and the allegations are sufficient to support such a claim having been made.

88. *See United States v. Beecroft*, 608 F.2d 753, 757 (9th Cir.1979) (both communication of half truths and concealment of material facts are actionable under the mail fraud statute).

89. Although we have referred to TACA's goals and the benefits it received, they are not necessary. The fact issues with regard to ALPA and Huttinger are sufficient to state the claim.

90. *United States v. Rasheed*, 663 F.2d 843, 849 (9th Cir.1981), *cert. denied*, 454 U.S. 1157, 102 S.Ct. 1031, 71 L.Ed.2d 315 (1982).

91. Because he retired at the appropriate time, Huttinger qualified for pension benefits. However, the pension plan was underfunded and could not afford to pay full benefits to all the pilots eligible for retirement under the plan. Thus, one could infer from the undisputed facts that once Huttinger began receiving payment under the plan, or realized he could qualify for benefits and preempt any other pilots from doing so, he had an incentive to provoke the relo-

Only ALPA has controverted the goals, outlined above, which pilots have asserted. In an unchallenged affidavit ALPA has stated that the cost of representing the TACA pilots was not a factor in its negotiating strategy or posture. We point out that ALPA has *not* said exactly what it was trying to accomplish on behalf of the pilots. ALPA also has not denied that it was threatened with criminal prosecution and civil damage suits. In light of the remaining undisputed facts and the inferences therefrom, we find that mail fraud has been sufficiently alleged to create genuine factual issues regarding predicate acts of racketeering activity.

We also disagree with the trial court's disposition of the allegations of mail fraud in connection with Huttinger's receipt of pension benefits. F.R.Civ.P. 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." However, Rule 9(b) is read in connection with F.R.Civ.P. 8 which requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." [92] The pilots have certainly pleaded sufficient facts to put the defendants on notice of their claim with regard to Huttinger's receipt of pension benefits. As early as the Original Complaint,[93] the pilots alleged that Huttinger had breached his duty of fair representation, a fiduciary duty, by agreeing to the structuring of the termination agreement in such a way that

Huttinger's pension would be funded, but no one else's. Additionally, in the amended complaint, the pilots alleged that Huttinger applied for and is receiving pension benefits and that this was in connection with the scheme to defraud the pilots.

Finally, in the RICO Case Statement, the pilots spent a great deal of time detailing their factual allegations regarding Huttinger's receipt of pension funds. They alleged, in pertinent part, that Huttinger and ALPA bargained away TACA's obligation to continue funding the pension plan in return for TACA's agreement not to bring civil or criminal charges against ALPA for the acts of espionage described, *supra*. Huttinger was aware that this left the plan underfunded and that not all pilots would be able to receive their pension benefits. The pilots claimed that Huttinger intentionally failed to inform them of their right to apply for early retirement or of the fact that if they did not apply for benefits prior to the termination of funding, they would not be entitled to receive any benefits. Thus, the pilots argued that, in manifest abuse of his fiduciary position, Huttinger assured himself of his own benefits by keeping those he represented in the dark. We cannot conceive of how the defendants failed to be put on notice of the claim with the amount of detail that was provided. We find that the pilots have alleged with particularity the defendants' acts which they contend amount to fraud.[94]

cation, thereby denying the other pilots the opportunity to prove their eligibility.

Even before he began to receive retirement payments, Huttinger had an incentive to keep the pilots in ignorance of the effect a termination would have and of their rights under the plan. As chairman of the pension committee, he was in the perfect spot to have all the information needed to protect his interest and at the same time to know what information he should not disseminate in order to protect that interest against diminution by the claims of all the eligible pilots.

92. F.R.Civ.P. 8(a)(2); *see Ross v. A.H. Robins Co.*, 607 F.2d 545, 557 n. 20 (2d Cir.1979), *cert. denied*, 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980) ("The requirement of particularity does not abrogate Rule 8, and it should be

harmonized with the general directives ... of Rule 8 that the pleading should contain a 'short and plain' statement of the claim or defense and with each averment should be 'simple, concise and direct.' Rule 9(b) does not require nor make legitimate the pleading of detailed evidentiary matter.") (Citations omitted).

93. The claims alleged in the original complaint were dismissed before the RICO claim was addressed by the trial court. The factual allegations contained in the Original Complaint are relevant to the RICO claim, however, because the Amended Complaint incorporates them all by reference.

94. *See Unimobil 84, Inc. v. Spurney*, 797 F.2d 214, 217 (5th Cir.1986).

### 4. Violation of 18 U.S.C. § 664 [95]

Pilots allege that Huttinger's receipt of retirement benefits is a violation of 18 U.S.C. § 664. The trial court did not address this issue, finding that pilots had not pleaded the issue in its Original or Amended Complaints. We disagree, finding the allegation at Paragraph 39 of the Amended Complaint where pilots said: "On information and belief, ... TACA and Charles J. Huttinger converted money and funds of the TACA pilot's employee benefit plan for their own uses." Additionally, the trial court found that pilots had adduced no evidence on this claim since the only relevant affidavit was not based on personal knowledge. We deal with this finding below.

Pilots have not directly shown, by affidavit or otherwise, what acts constituted conversion, who committed these acts, when the acts were done, or by whom. However, it is clear, in connection with pilots' other factual allegations, that they are referring to Huttinger's receipt of retirement benefits.

The Ninth Circuit dealt extensively with § 664 liability in *United States v. Andreen*, 628 F.2d 1236 (9th Cir.1980). The terms in the statute are to be given their traditional meanings. Thus, "[t]he concept of unlawful conversion encompasses the use of property, placed in one's custody for a limited purpose, in an unauthorized manner or to an unauthorized extent." [96] Embezzlement "encompasses the fraudulent appropriation of the property of another by one in lawful possession thereof." [97] The statute encompasses more than traditional embezzlement and unlawful conversion, however, and imposes liability for intentional breaches of special fiduciary duties imposed by other statutes or the instruments governing the trust. [98]

The RICO defendants argue that pilots have not stated a predicate act here because they have shown neither scienter, [99] nor that Huttinger's receipt of pension benefits was "substantially inconsistent with the fiduciary purposes and objectives of the ... pension plan, as set forth by statutes, bylaws, charters, or trust documents which govern uses of the funds in question." [100]

We state once again that pilots' burden in response to the motions for summary judgment was not to prove its case, but to show the existence of genuine and material fact issues regarding its essential elements. The RICO defendants have not produced any evidence negating the scienter element. They have not demonstrated that Huttinger did not act willfully, that is "with a fraudulent intent or a bad purpose or an evil motive." [101] Since the movants have not shown the absence of any disputed fact issues in this regard, they have failed to meet their burden. Thus the allegations in the pilots' Complaints stand and remain for resolution on remand.

The fact that pilots have made allegations which the RICO defendants refute in brief but not with facts, by way of affidavit evidence or otherwise, shows that factual issues remain to be resolved. The only way movants could prevail on this aspect of their summary judgment motion is by a legal finding that Huttinger did not breach any fiduciary duties under ERISA or 29

---

**95.** 18 U.S.C. § 664 Theft or embezzlement from employee benefit plan:

Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use or to the use of another, any of the moneys, funds, securities, premiums, credits, property, or other assets of any employee welfare benefit plan or employee pension benefit plan, or of any fund connected therewith, shall be fined not more than $10,000, or imprisoned not more than five years, or both.

**96.** *Id.* at 1241, citing, *Morissette v. United States*, 342 U.S. 246, 272, 72 S.Ct. 240, 254, 96 L.Ed. 288 (1952).

**97.** *Id.*, citing, *United States v. Dupee*, 569 F.2d 1061, 1064 (9th Cir.1978).

**98.** *Id.*

**99.** *Id.* Scienter is an essential element of a § 664 violation.

**100.** Brief of ALPA and Huttinger at 36–37, citing, *United States v. Andreen*, 628 F.2d 1236, 1241 (9th Cir.1980).

**101.** *Id.*

U.S.C. § 501.[102] As we found above that Huttinger clearly did breach fiduciary duties,[103] the factual issues remain to be resolved.

## C. Pattern

The United States Supreme Court has recently revised and "clarified" the definition of pattern in the RICO statute. In *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. ——, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), the Supreme Court rejected the Eighth Circuit's "multiple scheme" requirement and also disagreed with "those courts that have suggested that a pattern is established merely by proving two predicate acts."[104] The Fifth Circuit has explicitly recognized that *H.J. Inc.* narrowed the definition of pattern from that previously used in this circuit.[105] Thus prior Fifth Circuit precedent, and those cases cited by the parties, are of little assistance to us.

In *H.J. Inc.*, the Supreme Court found that

RICO's legislative history reveals Congress' intent that to prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity.[106]

The relationship element has been defined by borrowing from a related statute. "[C]riminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated events."[107] The Supreme Court found the definition of continuity more difficult, and opted for a flexible approach that they believe derives from a common everyday understanding of RICO.

What a plaintiff or prosecutor must prove is continuity of racketeering activity, or its threat, *simpliciter.* ... "Continuity" is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition. ... It is, in either case, centrally a temporal concept—and particularly so in the RICO context, where *what* must be continuous, RICO's predicate acts or offenses, and the *relationship* these predicates must bear to one another, are distinct requirements.[108]

---

**102.** Pilots allege that Huttinger breached the fiduciary duties imposed by ERISA and those created by 29 U.S.C. § 501. The ERISA claims are dealt with, *supra.* 29 U.S.C. § 501. Fiduciary responsibility of officers of labor organizations:

(a) The officers, agents, shop stewards, and other representatives of a labor organization occupy positions of trust in relation to such organization and its members as a group. It is, therefore, the duty of each such person ... to hold its money and property solely for the benefit of the organization and its members. ...

**103.** *See supra,* ERISA portion of opinion.

**104.** *H.J., Inc.*, 492 U.S. at ——, 109 S.Ct. at 2899, 106 L.Ed.2d at 206.

**105.** *Smith v. Cooper/T. Smith Corp.*, 886 F.2d 755, 756 (5th Cir.1989). The prior Fifth Circuit pattern requirement was described in *R.A.G.S. Couture, Inc. v. Hyatt*, 774 F.2d 1350, 1355 (5th Cir.1985) (holding that two "related" acts of mail fraud constitute a pattern).

**106.** *H.J. Inc.*, 492 U.S. at ——, 109 S.Ct. at 2900, 106 L.Ed.2d at 208.

**107.** *Id.* The definition of relationship thus adopted is the pattern definition from Title X of the Organized Crime Control Act (OCCA), which is the Dangerous Special Offender Sentencing Act, 18 U.S.C. § 3575, *et seq.* RICO forms Title IX of the OCCA.

**108.** *Id.*, 492 U.S. at ——, 109 S.Ct. at 2901, 106 L.Ed.2d at 209. The Court went on to clarify how "continuity" may be proved.

A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Prediate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct. Often a RICO action will be brought before continuity can be established in this way. In such cases, liability depends on whether the *threat* of continuity is demonstrated.

■ The relationship element is easily satisfied here by pilots' allegations. First, all of the predicate acts were aimed at achieving a single goal—relocation of the pilots' base to El Salvador. Only through the accomplishment of this goal could all of the RICO defendants' subsidiary goals be accomplished. Second, we find the participants were the same: ALPA and Huttinger. Third, the victims were the same: the pilots. Finally, the events are in no way isolated, but are related in the sense that they all occurred or commenced during or grew out of the process of negotiating TACA's relocation program. The RICO defendants have put on some evidence that might negate the first element. For example, they have showed that ALPA's actions were not motivated by a desire to rid itself of a small, costly union. They have not, however, rebutted the allegation that ALPA gave in to TACA to avoid prosecution for its sabotage activities. Likewise, they have tried to show that Huttinger's receipt of pension benefits was proper from the standpoint of FBA. They have not, however, removed factual disputes regarding the propriety of Huttinger's activities or his goals.

In sum, pilots have alleged relationship. The RICO defendants' affidavits and submissions do not "show that there is no genuine issues as to any material fact" in this regard. F.R.Civ.P. 56(c). Thus, on remand, the trial court must determine whether the relationship element of the pattern requirement is met.

We find that the continuity element of the pattern requirement is disposed of by our prior discussion of the RICO person requirement. There we found the existence of factual issues regarding the threat of continued racketeering activity by these defendants/appellees. At least some of the racketeering acts that threaten to continue are related under the test applied above and for the same reasons.

## D. Enterprise

Pilots have developed two alternative theories of the enterprise. The above discussion has made reference to these separate claims where necessary, and they will be dealt with in detail here.

### 1. "Association-in-Fact" Enterprise

■ An association-in-fact enterprise must also meet a continuity requirement. Such an enterprise "(1) must have an existence separate and apart from the pattern of racketeering, (2) must be an ongoing organization and (3) its members must function as a continuing unit shown by a hierarchical or consensual decision making structure."[109] We find that the association-in-fact enterprise, if it ever existed, was one that "briefly flourished and faded" and therefore fails to meet the requirement that it function as a continuing unit. We do not believe this to be inconsistent with our findings of fact issues regarding continuity in the RICO person and the pattern requirements. There the threat was sufficient if it came from an individual. Here pilots were required to show that the enterprise as a whole functioned as a continuing unit. In a case like this, where the enterprise's goals have been accomplished, and where those goals were achieved in a matter of months, through a discrete pattern of activity, there is no continuity.

In addition, pilots have not alleged or shown the existence of an enterprise separate and apart from the pattern of racketeering activity.[110] It appears that once the "Pilots' Agreement" was reached, and the follow-up acts—such as obtaining the pilots' severances and terminating ALPA

**109.** *Delta Truck & Tractor, Inc. v. J.I. Case Co.,* 855 F.2d 241, 243 (5th Cir.1988), *cert. denied,* — U.S. ——, 109 S.Ct. 1531, 103 L.Ed.2d 836 (1989), *citing, Manax v. McNamara,* 842 F.2d 808, 811 (5th Cir.1988); *Foval v. First Nat'l Bank of Commerce,* 841 F.2d 126, 129–30 (5th Cir. 1988); *Montesano v. Seafirst Commercial Corp.,* 818 F.2d 423, 426–27 (5th Cir.1987); *Atkinson v. Anadarko Bank & Trust Co.,* 808 F.2d 438, 440–41 (5th Cir.1987), *cert. denied,* 483 U.S. 1032, 107 S.Ct. 3276, 97 L.Ed.2d 780 (1987); *Shaffer v. Williams,* 794 F.2d 1030, 1032 (5th Cir.1986).

**110.** *See Ocean Energy II v. Alexander & Alexander, Inc.,* 868 F.2d 740, 748–49 (5th Cir.1989), *citing, Montesano v. Seafirst Commercial Corp.,* 818 F.2d 423, 427 (5th Cir.1987).

representation—had occurred, the enterprise ceased to exist. In reality, the association of ALPA and Huttinger had no alleged purpose other than to commit the predicate acts leading up to the relocation.

### 2. ALPA as Enterprise

 The pilots' second enterprise theory sees ALPA as the legal enterprise which was a vehicle for racketeering activities by TACA and Huttinger.[111] There is no question that ALPA itself satisfies § 1961(4)'s definition of enterprise: " 'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." ALPA was continuously in existence throughout the period when the alleged predicate acts occurred. It remains in existence today. Thus this district court erred in not finding an enterprise under this theory.

### E. RICO Conclusion

We have found that TACA is not an appropriate RICO defendant because pilots did not allege that it constitutes a continuing threat. ALPA is a RICO defendant only for purposes of the § 1962(b) violation; it cannot be both the enterprise and a defendant for purposes of the § 1962(c) claim. Huttinger is properly a RICO defendant as to all of pilots' claims.

With regard to the alleged *predicate acts* of racketeering activity, we have affirmed the trial court in some regards and reversed in others. We agree with the trial court that the extortion claim was not properly alleged nor supported by the record. The 29 U.S.C. § 186 claim cannot stand because RLA employers and employees, as a matter of law, are not subject to this provision of the LMRA. We reverse the trial court's decision with respect to the mail and wire fraud claims. There are genuine issues of material fact. Finally, we find that the summary judgment movants have not met their burden of showing the absence of factual disputes regarding

Huttinger's alleged embezzlement or conversion. Thus pilots' allegations remain to be resolved on remand.

The Supreme Court's recent decision in *H.J., Inc.* holds that in order to prove a *pattern* of racketeering activity, the RICO plaintiff must show both relationship and continuity. We affirm the trial court's holding that a pattern was properly alleged under this new test. The increased complexity of the new test requires that we remand this issue for resolution of material factual disputes.

Finally, we affirm in part and reverse in part the trial court's holding that there was no *enterprise* alleged. We agree that there was no "association-in-fact" enterprise alleged because pilots could not show the requisite continuity. However, we hold that the pilots properly alleged that ALPA is a RICO enterprise.

### V. Discovery Issues

The pilots filed an amended complaint setting forth a RICO claim on April 6, 1987 and a RICO Case Statement, required by the district court's standing order, on August 25, 1987. At no time in this interval did the pilots seek discovery. ALPA, TACA and Huttinger moved for summary judgment on the RICO claims and those motions were set for hearing on October 21, 1987. After the motions were set for argument, the pilots requested and received a "courtesy" continuance[112] postponing the hearing until December 2, 1987. Once they had the continuance, pilots noticed the depositions of Huttinger, FBA and Captain Donald Scott for the last week in October.

TACA, ALPA and Huttinger moved for protective orders pursuant to F.R.Civ.P. 26(c) and (d) to prevent the taking of these depositions prior to the resolution of the summary judgment motions. The hearing on the summary judgment motions was again continued so that the requests for protective orders could be heard. At ALPA's request the depositions were re-

---

**111.** ALPA's position as a defendant under this theory is discussed, *supra* at Part IV.A.1.

**112.** We adopt this term to refer to an unopposed continuance motion signed by the trial court.

scheduled to mid-December. The trial court granted the protective order staying discovery pending its decision on the summary judgment motions. Eventually, the summary judgment motions were granted on March 17, 1988, with no discovery having been taken.

In its order, the trial court stayed discovery pursuant to F.R.Civ.P. 26(c) "for good cause." It found that many of the issues raised by the summary judgment motions were purely legal and that discovery would therefore not aid their resolution. As to the factual issues presented by the motion, the trial court ruled that "the plaintiffs have failed to identify with the requisite specificity of F.R.Civ.P. 56(f) the issues which must be amplified by discovery."

F.R.Civ.P. 56(f) provides that:

Should it appear from the affidavits of a party opposing the [summary judgment] motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

 However, what existed below was not a Rule 56(f) motion. In the typical 56(f) case, a nonmovant submits affidavits and requests additional time to conduct discovery to enable him to respond to a summary judgment motion. In the case at bar, a continuance was granted. In the time thus created before the hearing on the motions, the pilots sought discovery to enable them better to respond. In the ordinary course of events this discovery would have been freely allowed, even unquestioned.

However, in this case, the summary judgment movants, ALPA, TACA and Huttinger, moved the court for a Rule 26(c) protective order to prevent the taking of the depositions. Thus the burden was on ALPA, TACA and Huttinger to show why a protective order was warranted. The burden was not on the pilots, other than in rebuttal, to show why the discovery was needed.[113] Although the trial court applied the wrong standard and placed the burden on the wrong party, we find that it reached the correct result.

"Upon motion by a party or by the person from whom discovery is sought, and for good cause shown," a district court is authorized to "make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." F.R. Civ.P. 26(c). In their motions for protective orders, the defendants gave several reasons why this discovery was not needed prior to the resolution of the summary judgment motions which, if granted, would preclude the need for the discovery altogether. They correctly stated that no discovery was needed to resolve the motions to dismiss under F.R.Civ.P. 12(b)(6). Such motions are decided on the face of the complaint. Defendants also argued that the summary judgment motions could be decided as a matter of law on the basis of the undisputed facts already before the court. They alleged that the timing of the depositions—coming as they did after the grant of a courtesy continuance to respond to the motions—was evidence of bad faith. Finally, they argued that since the discovery was not needed to resolve the summary judgment motions—and thus perhaps

---

**113.** Had pilots sought a continuance for purposes of obtaining summary judgment evidence, the burden would have been on them to demonstrate "'how postponement of a ruling on the motion [would] enable [them], by discovery or other means, to rebut the movant's showing of the absence of a genuine issue of fact.'" *S.E.C. v. Spence & Greene,* 612 F.2d 896, 901 (5th Cir.1980), *citing, Willmar Poultry Co. v. Morton–Norwich Products, Inc.,* 520 F.2d 289, 297 (8th Cir.1975), *cert. denied,* 424 U.S. 915, 96 S.Ct. 1116, 47 L.Ed.2d 320 (1976). However, as we

have stated, *supra,* no Rule 56(f) motion was filed. Pilots had already received the continuance order when they noticed the depositions. Pilots had a rebuttal burden, but no burden to make a prima facie showing of need.

We acknowledge that pilots filed a Rule 56(f) affidavit in response to the motions for protective orders. This was an inappropriate response on their part. Pilots did not have the burden to make a Rule 56(f) showing to counter the Rule 26(c) motions.

not needed at all—the depositions would be unduly expensive and burdensome.

We find that by these arguments ALPA, TACA and Huttinger met their burden of showing, *prima facie*, why a protective order was warranted—that is, why the discovery sought would be unduly burdensome and expensive. Thus the burden reverted to the pilots, on rebuttal, to show a need for the depositions such that their burden and expense would not be "undue." Pilots did respond. They argued that the case was still in a "preliminary stage" given the complexity of the legal issues involved and that they had "always contemplated discovery" but that the "early motions of the defendants simply required none." Also they pointed to the fact that no pretrial discovery deadline had been set.

The protective order suspended activity until a decision could be made on the summary judgment motion. The trial court sought to resolve an issue that might preclude the need for the discovery altogether thus saving time and expense.[114] In response to the movants' showing, the pilots failed to show the protective order was unwarranted. They asserted no facts they hoped to adduce, no genuine issues of material fact they hoped to create, no showing they hoped to rebut. In fact pilots said they had sufficient evidence to defeat the summary judgment motions and sought discovery only to obtain "better" evidence.

We find that pilots' showing was insufficient. " '[A] plaintiff's entitlement to discovery prior to a ruling on a motion for summary judgment is not unlimited and may be cut off when the record shows that the requested discovery is not likely to produce the facts needed by [the party] to

withstand a Rule 56(e) motion for summary judgment.' "[115]

Discovery is not justified when cost and inconvenience will be its sole result.[116] On the record before it, the trial court had to reach the decision that it did reach. The procedural posture of the case and the showings of the parties left it little choice. Whether the trial judge surmised that pilots would not be able to defeat the summary judgment motions or whether he, like us, saw sufficient disputed facts to preclude summary judgment is irrelevant. Under the circumstances, there was no abuse of discretion in the order staying discovery until the summary judgment motions were resolved.[117]

Of course our finding that the stay of discovery was not an abuse of discretion has no effect as to those matters remanded. The parties are entitled to the full scope of discovery generally available during preparation for trial.

## VI. Conclusion

Our opinion affirms in part, reverses in part, and remands in part.

We affirm the trial court's holding that pilots' labor law claims were barred by the statute of limitations.

As for ERISA, we reverse the trial court's holding that the Plan was not in effect until April 15, 1985. On remand, we instruct the court to accept as a matter of law that the Plan was in effect on February 1, 1982.

We reverse the court's holding that there were no genuine issues of material fact as to whether ALPA, TACA, or Huttinger had

114. Trial courts possess broad discretion to supervise discovery. *Pan-Islamic Trade Corp. v. Exxon Corp.*, 632 F.2d 539, 550 (5th Cir.1980), *cert. denied*, 454 U.S. 927, 102 S.Ct. 427, 70 L.Ed.2d 236 (1981).

115. *Williamson v. United States Dept. of Agriculture*, 815 F.2d 368, 382 (5th Cir.1987), *citing*, *Paul Kadair, Inc. v. Sony Corp. of America*, 694 F.2d 1017, 1029–30 (5th Cir.1983).

116. *See Washington v. Norton Manufacturing, Inc.*, 588 F.2d 441, 447 (5th Cir.1979), *cert. denied*, 442 U.S. 942, 99 S.Ct. 2886, 61 L.Ed.2d 313

(1979) (discovery properly denied where it "could not have added any significant facts and would only have been expensive and burdensome ..."); *Wyatt v. Kaplan*, 686 F.2d 276, 284 n. 15 (5th Cir.1982) (clarifying *Washington*).

117. *See Scroggins v. Air Cargo, Inc.*, 534 F.2d 1124, 1133 (5th Cir.1976) (no abuse of discretion in limiting discovery to issues raised by the summary judgment motions, although "the situation would be quite different if plaintiff had been denied discovery which related to the summary judgment motion").

any fiduciary duties under the Plan. On remand, we instruct the court to determine whether ALPA, TACA, or Huttinger had any fiduciary duties with respect to the ERISA-based wrongs alleged in the complaint. We also find as a matter of law that Huttinger had a fiduciary duty to disclose information about the Plan when asked.

On the RICO issues, we affirm the trial court's holdings that: (i) TACA is not a RICO defendant;[118] (ii) pilots have not properly alleged extortion or a violation of 29 U.S.C. § 186 as predicate acts; (iii) a pattern of racketeering activity was alleged; and (iv) no association-in-fact enterprise existed.

We reverse the trial court and hold that ALPA was a RICO enterprise. Finally, we find that genuine issues of material fact exist with regard to the following allegations made by the pilots: (i) ALPA and Huttinger are RICO persons and thus appropriate RICO defendants; (ii) predicate acts of mail and wire fraud and an 18 U.S.C. § 664 violation occurred; (iii) a pattern of racketeering activity exists; and (iv) ALPA constitutes an enterprise for RICO purposes. Because we find that a genuine issue of material fact exists as to each of the elements essential to stating a valid RICO claim, we remand these issues to the trial court for proceedings not inconsistent with this opinion.

Lastly, we affirm the trial court's decision to grant a protective order staying discovery pending its summary judgment decision. Our affirmance of this order has no effect as to those matters remanded. We expect that discovery will proceed on a normal course at that time.

AFFIRMED IN PART, REVERSED IN PART AND REMANDED.

## ON PETITION FOR REHEARING

PER CURIAM:

■ Defendants–Appellees Air Line Pilots Association, International (ALPA) and Charles J. Huttinger (Huttinger) petition this court for rehearing in our opinion, *Landry v. Air Line Pilots Association International AFL–CIO*, 901 F.2d 404 (5th Cir.1990). In *Landry*, we reversed the District Court's grant of summary judgment to ALPA and Huttinger.[1] Although we remanded the case to the District Court for a determination of several issues, we also entered findings against ALPA and Huttinger as to the following: (i) "we instruct the court on remand to accept as a matter of law that the [retirement plan for the plaintiffs-pilots] was in effect on February 1, 1982" *Landry*, at 417; and (ii) "we find as a matter of law that Huttinger had a fiduciary duty to disclose information about the Plan when asked."[2] *Landry*, at 420.

In their petition for rehearing, ALPA and Huttinger urge that on a motion for summary judgment, the Court's role "is not ... to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Mozeke v. International Paper Co.*, 856 F.2d 722 (5th Cir.1988). This court went too fast in making findings against ALPA and Huttinger. Because they have never been placed on notice of any need or obligation to respond to any of plaintiffs' assertions (i.e., that a failure to respond

---

**118.** We also find that ALPA is not a RICO defendant for purposes of the § 1962(c) claim.

**1.** TACA International Airlines, S.A. was also a defendant in that action. TACA's petition for rehearing, however, has been denied.

**2.** We also inadvertently stated: "As we found above that Huttinger clearly did breach fiduciary duties, the factual issues [as to whether 18 U.S.C. § 664 was violated] remain to be re-

solved." *TACA* at 432. We intended to assert that "Huttinger clearly did *possess* fiduciary duties." Obviously, however, in light of our discussion herein, we no longer make any conclusive findings with respect to Huttinger's fiduciary duties, except to hold that a genuine issue of material fact exists as to whether or not he had any fiduciary duties. Factual issues also exist as to whether any fiduciary duties which Huttinger may have had were breached.

**438**

could subject them to adverse factual findings or to adverse legal determinations predicated on such factual determinations), as, for example, they would have been had plaintiffs cross-moved for relief, the effect of entry of factual findings against ALPA and Huttinger under these circumstances deprived them of an opportunity to dispute the facts material to the plaintiffs' claims. *Fountain v. Filson,* 336 U.S. 681, 683, 69 S.Ct. 754, 755, 93 L.Ed. 971 (1949); *E.C. Ernst, Inc. v. General Motors Corp.,* 537 F.2d 105, 109 (5th Cir.1976).

Accordingly, we modify our earlier opinion to withdraw the two findings, *supra.* Instead, based on the evidence discussed in *Landry,* we now hold that there was a genuine issue of material fact as to whether (i) the retirement plan was in effect on February 1, 1982, and (ii) Huttinger had a fiduciary duty to disclose information about the plan when asked. On remand, after the parties have been given a full opportunity to discover and present the evidence, these issues are for determination by the trier of fact in accordance with our earlier opinion, *Landry v. ALPA,* 901 F.2d 404, as modified herein.

ALPA and Huttinger have also questioned our use of 29 U.S.C. § 501(a) in the portion of our opinion which holds that a fact issue exists as to whether there was a violation of 18 U.S.C. § 664 (a RICO predicate act). Section 501(a) imposes special fiduciary duties upon officers of labor organizations. As we stated in our opinion, *see Landry* at 431, text accompanying note 98, a breach of special fiduciary duties may be a violation of § 664. In order to clarify this holding, we insert the following text at the end of the existing footnote 102, *Landry* at 432:

> We find that a fact issue exists as to whether Huttinger breached any of the fiduciary duties imposed by 29 U.S.C. § 501(a). As we state, *supra,* "intentional breaches of special fiduciary duties imposed by other statutes ..." then 18 U.S.C. § 664 may give rise to liability under 18 U.S.C. § 664.

With respect to ALPA and Huttinger's criticism of that portion of our footnote 87,

*Landry* at 429, which states that state law fraud may serve as a source of substantive law for the mail fraud claim and the question of pre-emption which they raise, we neither approve nor disapprove their position. The resolution of this issue must await the development of all the facts before the trier of fact.

In all other respects, the petition of ALPA and Huttinger for rehearing is denied.